**In the Matter of ROBBINS INTERNATIONAL, INC., Debtor.**

**Robbins International, Inc., Plaintiff–Appellee,**

v.

**Robbins MBW Corp., Defendant– Appellant.**

No. 99 Civ. 11952(LTS).

United States District Court, S.D. New York.

March 7, 2002.

Backenroth, Frankel & Krinsky, LLP, by Abraham J. Backenroth, Mark A. Frankel, New York City, for plaintiff-appellee.

Melvin Lloyd Robbins, New York City, Finkel, Goldstein, Berzow & Rosenbloom, LLP, by Harold Berzow, New York City, for defendant-appellant.

## OPINION

SWAIN, District Judge.

Robbins MBW Corp. ("MBW") appeals from a Post–Trial Memorandum Decision of the United States Bankruptcy Court for the Southern District of New York (Stuart Bernstein, J.) (the "Memorandum Decision") expunging certain claims of MBW against Robbins International Inc. ("Robbins International" or the "Debtor"), and from the Bankruptcy Court's orders denying MBW's cross-motion for summary judgment and MBW's motion to reargue its cross-motion for summary judgment.

For the reasons stated below, the Memorandum Decision is affirmed.[1]

This Court has jurisdiction of the instant appeal pursuant to section 158(a)(1) of Title 28 of the United States Code (West Supp.2001) and Rule 8001 of the Federal Rules of Bankruptcy Procedure (West Supp.2001).

## BACKGROUND [2]

MBW operated a retail clothing store chain selling men's and boy's clothing at several locations in the New York area. On November 18, 1994, MBW and Izzy Ashkenazy ("Ashkenazy") entered into an asset purchase agreement (the "Purchase Agreement") wherein Ashkenazy agreed to buy MBW's assets, which included MBW's warehouse inventory and store merchandise as well as MBW's leases, leasehold

---

1. For reasons discussed below, MBW's interlocutory appeals are dismissed as moot.

2. Unless otherwise indicated by citation to the record, the following factual recitation is taken from the Memorandum Decision.

improvements, trade fixtures, trade name and good will.[3] *See* Purchase Agreement, § 3. Pursuant to section 4.2 of the Purchase Agreement, the purchase price, less $3.9 million, was due at the closing.

Section 4.2 of the Purchase Agreement initially provided:

At the Closing, (i) an amount equal to the Total Purchase Price minus $3,900,000 shall be paid to [MBW] by bank check or certified funds ("Good Funds") and (ii) [Ashkenazy] shall deliver to [MBW] a promissory note (the "Note") from [Ashkenazy] and those other entities referred to in [Section 5.11[4]] to MBW in the principal sum of Three Million Nine Hundred Thousand ($3,900,000) Dollars. The Note shall mature on January 10, 1996, shall bear interest at the rate of eight (8%) per cent per annum, which will accrue from the Closing Date, and shall be payable at [Ashkenazy's] bank within the City of New York … in twelve (12) equal monthly installments of principal of Three Hundred Twenty–Five Thousand ($325,000) Dollars, together with interest on the outstanding principal amount, commencing on February 10, 1995.

Purchase Agreement, § 4.2.

The assignment or sublet of MBW's leases was a principal component of the sale transaction. Section 5.11 of the Purchase Agreement provided:

It is understood by and between the parties hereto that [Ashkenazy] intends to organize a separate corporate entity for the purpose of leasing all of the store locations and another corporate entity for operating all of the store locations. [Ashkenazy] shall have the right to assign each lease and/or the included assets to either such corporate entity to be established, provided such assignment shall not relieve [Ashkenazy] of its obligations hereunder or violate the terms of the applicable lease or the terms of any consent granted by a landlord to the assignment to [Ashkenazy]. [Ashkenazy] covenants that all other business entities he forms or organizes in connection with the Business and the transactions contemplated herein shall be bound by the terms of and shall be jointly and severally liable for the obligations under the Agreement.

Purchase Agreement, § 5.11.

Section 5.11 of the Purchase Agreement reflects Ashkenazy's intent to utilize an operating company and a leasing company, which were the two "other entities" referred to in section 5.11. The operating company was incorporated as Robbins Men and Boy's Wear Corp., (which subsequently became on Robbins International, *i.e.*, the Debtor) shortly after the Purchase Agreement was executed. The leasing company, Robbins Stores, Inc. ("Robbins Stores"), was in existence at the time MBW and Ashkenazy signed the Purchase Agreement.

The Purchase Agreement also provided that Ashkenazy would indemnify MBW in the event MBW had any liability under the leases. Purchase Agreement, § 5.9. Ashkenazy's obligation to indemnify MBW for rent and other recurring charges terminated on January 31, 1996. *Id.* The parties also agreed that the Debtor would execute guaranties to Robbins Stores in connection with the lease assignments. *See* Debtor Exh. 3.

---

**3.** Section 24 of the Purchase Agreement provided that the Purchase Agreement would be governed and construed according to New York law.

**4.** The Purchase Agreement refers to section 5.10, but the parties agree, and it is clear from the Purchase Agreement itself, that the intended cross-reference was to section 5.11.

Under Section 5.1 of the Purchase Agreement, MBW was required to deliver at the closing consents, from the landlords holding the store leases (the "Landlords"), in respect of the assignment of those leases. *Id.* § 5.1(a). Ashkenazy executed the Purchase Agreement in his own name. "Individually."

Prior to the closing, which was originally scheduled for November 21, 1994, it appeared that MBW would be unable to deliver the Landlords' consents. Tr. at 23–24. Under section 4.2 of the Purchase Agreement, Robbins Stores and the Debtor were required to co-sign the $3.9 million Promissory Note with Ashkenazy. The parties recognized, however, that if those entities became parties to the Promissory Note, their net worth would be negative and the Landlords would be unlikely to consent to the lease assignments. Tr. at 30. In order to save the deal, the parties negotiated modifications to the Purchase Agreement. Tr. at 30–31.

The parties agreed to amend the Purchase Agreement to provide that Ashkenazy's wife would sign the Promissory Note and that the new corporations, Robbins Stores and the Debtor, would not. To effectuate this modification, the parties executed an amendment to section 4.2 of the Purchase Agreement (the "Amendment") which changed section 4.2 to provide, *inter alia,* that "[Ashkenazy] shall deliver to [MBW] a promissory note ... from [Ashkenazy] and his wife, Shula Ashkenazy, to [MBW] in the principal sum of Three Million Nine Hundred Thousand ($3,900,000) Dollars; and (iii) [Ashkenazy] shall assume the Trade Payables...." Amendment to Section 4.2 of the Purchase Agreement.

The Amendment eliminated the language requiring delivery of a promissory note executed by Ashkenazy and "those other entities referred to in [Section 5.11]." In addition, under the Amendment, Ashkenazy agreed to satisfy the trade payables, which amounted to $1.3 million, and he agreed to be the sole shareholder of Robbins Stores and the Debtor until the Promissory Note was paid.

Ashkenazy agreed to provide MBW with certified financial statements by November 30, 1994, evidencing that the corporate entity to which each lease was assigned had sufficient net worth to show financial responsibility. Section 5.11 of the Purchase Agreement, which dealt with Ashkenazy's intention to form an operating company and a leasing company that would hold the leases, was not modified. Ashkenazy signed the Amendment "Individually;" no person or entity other than MBW and Ashkenazy signed the Amendment.

At the closing, which took place on November 22, 1994, Ashkenazy delivered the Promissory Note, signed by himself and his wife. *See* MBW Exh. P. Arbitration and trademark agreements signed by Ashkenazy, both individually and on behalf of Robbins Stores and the Debtor, were also delivered at the closing.

Subsequent to the closing, MBW's attorneys delivered letters to the Landlords seeking their consents for the assignment or sublet of the leases. The letters also purported to attach the Debtor's guaranty of the lease obligations (Debtor Exh. 3) and the Debtor's uncertified financial statements, which reflected no liability for the leases and the Promissory Note.[5]

---

**5.** Debtor Exhibit 3 does not contain copies of the guaranties. The trial record, however, includes MBW Exhibit D which contains a copy of a guaranty, marked "specimen," in favor of one of the Landlords. The guaranty contained in MBW Exhibit D is signed by the Debtor under its former corporate name and is dated November 24, 1994. MBW Exhibit D was admitted into evidence at trial together with MBW Exhibits A – R. Tr. at 50. There is

*Proceedings Below*

On April 26, 1996, MBW and other creditors filed an involuntary chapter 7 petition against the Debtor. On March 4, 1997, the Debtor consented to an order for relief under chapter 11 of the Bankruptcy Code. Subsequently, the Debtor filed a plan for liquidating its assets. MBW filed two proofs of claim in the Debtor's bankruptcy case. Claim number 158 is a claim for $3.9 million, based on breach of contract, for the balance of purchase price from the sale of MBW's sale of assets to Ashkenazy (the "Acquisition Claim"). Claim number 159 is a $1.6 million breach of contract claim seeking reimbursement of rents paid by MBW to the Landlords following the closing of the transaction (the "Landlord Reimbursement Claim").

The Debtor commenced an adversary proceeding against MBW, seeking to expunge Claims 158 and 159. Both parties filed motions for summary judgment. The Bankruptcy Court denied the motions and also denied MBW's motion for reargument. Because the Bankruptcy Court found, in its decisions on the motions for summary judgment, that the Purchase Agreement, as amended, was ambiguous as to whether the Debtor was liable for balance of the purchase price and for certain rent obligations paid by MBW to the Landlords, a trial was held on the issue of the parties' intent concerning the parties' respective obligations in connection with the sale of the MBW's assets to Ashkenazy. Upon conclusion of the trial, the Bankruptcy Court entered the Memorandum Decision expunging MBW's claims. This appeal followed.

*DISCUSSION*

*MBW's Interlocutory Appeals are Moot*

As a preliminary matter, the Court addresses MBW's appeal of the Bankruptcy Court's denial of its cross-motion for summary judgment and motion for reargument. Denial of a summary judgment motion is not ordinarily reviewable on appeal from a final judgment entered after trial on the merits. *Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 131–132 (2d Cir.1999); *see also Lama v. Borras,* 16 F.3d 473, 476 n. 5 (1st Cir.1994); *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.,* 51 F.3d 1229, 1237 (4th Cir. 1995); *Black v. J.I. Case Co.,* 22 F.3d 568, 570–71 (5th Cir.), *cert. denied,* 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 494 (1994); *Jarrett v. Epperly,* 896 F.2d 1013, 1016 (6th Cir.1990); *Watson v. Amedco Steel, Inc.,* 29 F.3d 274, 277 (7th Cir.1994); *Metropolitan Life Ins. Co. v. Golden Triangle,* 121 F.3d 351, 354 (8th Cir.1997); *Locricchio v. Legal Servs. Corp.,* 833 F.2d 1352, 1358–59 (9th Cir.1987); *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1250–51 (10th Cir.1992), *cert. denied,* 507 U.S. 973, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993); *Glaros v. H.H. Robertson Co.,* 797 F.2d 1564, 1569 (Fed.Cir.1986), *cert. dismissed,* 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987). "[T]he question of whether a party has met its burden must be answered with reference to the evidence and the record as a whole rather than by looking to the pretrial submissions alone. The district court's judgment on the verdict after a full trial on the merits thus supersedes the earlier summary judgment proceedings." *Massey–Ferguson Inc.,* 170 F.3d at 130 (quoting *Metropolitan Life*

no discussion of MBW Exhibit D in the trial record. Assessing the evidence at trial, the Bankruptcy Court made a finding, which is not clearly erroneous, that MBW did not offer evidence that the Debtor signed the guaran-

ties and that MBW had failed to show "whether or when the landlords consented to the assignments, and hence, when the guaranties became effective." Memorandum Decision, at 15, n. 8.

*Ins. Co.,* 121 F.3d at 354 (internal quotation marks omitted)).[6]

Accordingly, insofar as MBW seeks to appeal the Bankruptcy Court's denial of its cross-motion for summary judgment, the appeal is dismissed. For the same reasons, MBW's appeal of its motion for reargument is dismissed.[7] The issues to be decided in this appeal, therefore, concern solely the Bankruptcy Court's Memorandum Decision.

*Standard of Review*

■ On appeal, a bankruptcy court's conclusions of law are reviewed de novo and its findings of fact are reviewed for clear error. *In re Bonnanzio,* 91 F.3d 296, 300 (2d Cir.1996). Rule 8013 of the Federal Rules of Bankruptcy Procedure sets forth the standard governing a district court's review of a bankruptcy court's factual findings. The rule provides:

> On an appeal the district or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.

Fed.R.Bankr.P. 8013.

■ A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Metzen v. United States,* 19 F.3d 795, 797 (2d Cir.1994) (internal quotation marks and citation omitted). The clearly erroneous standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Factual find-

---

**6.** The Second Circuit has held that under extraordinary circumstances, a denial of summary judgment may be subject to post-trial review on appeal. *Massey–Ferguson,* 170 F.3d at 132. In *Massey–Ferguson,* the Second Circuit suggested that such extraordinary circumstances would lie in jurisdictional questions or in cases of manifest injustice. *Id.* (citing *Norton v. Sam's Club,* 145 F.3d 114, 117–18 (2d Cir.1998)) (court can order a new trial even in the absence of a renewed motion for judgment as a matter of law if failure to do so would result in "manifest injustice"), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998).

> A contract is ambiguous if the contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person in light of the entire contract and in light of the customs, practices, usages and terminology generally understood in the business. *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir. 1996); *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993); *Seiden Associates Inc. v. ANC Holdings, Inc.,* 959 F.2d 425,

428 (2d Cir.1992). In determining the summary judgment motions of the parties, the Bankruptcy Court found that the Purchase Agreement was ambiguous because the provisions dealing with the obligations of the Debtor and MBW with respect to the Promissory Note were capable of more than one meaning. The Bankruptcy Court therefore ordered a trial to discern the parties' intentions. The Court finds that there are no extraordinary circumstances meriting review of the Bankruptcy Court's denial of MBW's cross-motion for summary judgment.

**7.** The appropriate procedure for appeal of a denial of a motion for summary adjudication is that (1) the party may petition for the right to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b); or (2) if the case proceeds to trial, the party may make and renew motions pursuant to Rule 50 for judgment as a matter of law and appeal the district court's denial of that motion. *Massey–Ferguson Inc.,* 170 F.3d at 132. MBW did neither.

ings must be upheld if "plausible in light of the record viewed in its entirety." *Id.* Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. 1504.

*The Acquisition Claim*

 Determining the intention of the parties to an ambiguous contract is a question of fact to be resolved by the factfinder. *See Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994). The clearly erroneous standard applies in review of the Bankruptcy Court's factual finding that the parties to the Purchase Agreement intended that the Debtor would not be liable to MBW under the Purchase Agreement for the balance of the purchase price. In determining the parties' intent in an ambiguous contract, the factfinder examines the objective manifestations of the parties' intentions. *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 301 (S.D.N.Y.1997), *aff'd*, 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998). "This exclusive reliance upon evidence of objective manifestations of intent renders evidence of uncommunicated subjective intent irrelevant...." *Id.* Thus, "the only germane testimonial evidence is that of the objective manifestations of the parties' intent." *Id.* at 302.

 Trial testimony reflects that the parties amended Section 4.2 of the Purchase Agreement, relieving the Debtor and Robbins Stores of the obligation to sign the $3.9 million Promissory Note, in order to keep that liability off those entities' balance sheets and, thus, increase the likelihood that MBW would be able to obtain the Landlords' consents to the assignment or transfer of the store leases. If the Promissory Note liability had been reflected on the balance sheets of the Debtor and Robbins Stores, both entities would have had zero net worth. The parties believed that the Landlords would not consent to assignment of the store leases under such circumstances. Tr. at 30. During the closing, the parties agreed to amend Section 4.2 of the Purchase Agreement to make Ashkenazy's wife, rather than either or both of the two corporations, a signatory to the Promissory Note. The Bankruptcy Court found that the trial evidence demonstrated that the parties intended to shield the Debtor from liability for the purchase price in order to present a clean balance sheet to induce the Landlords to consent to the assignment of the store leases.

The Bankruptcy Court further found that the parties did not discuss amending Section 5.11 and that such failure was an oversight.[8]

In addition, the Bankruptcy Court found that MBW's conduct subsequent to the closing was consistent with the parties' intention to shield the Debtor from liability for the purchase price. MBW sued Ashkenazy and his wife in state court for the balance of the purchase price, but did not seek to recover the balance of the purchase price from the Debtor. The Bankruptcy Court found that MBW could not

**8.** In fact, section 5.11 of the Purchase Agreement is not inconsistent with the Bankruptcy Court's finding that the parties intended to shield the Debtor from liability for the balance of the purchase price. Section 5.11 provides, *inter alia*, that the "[p]urchaser covenants that all other business entities he forms or organizes in connection with the Business and the transactions contemplated herein shall be bound by the terms of and shall be jointly and severally liable for the obligations under the Agreement." Under the amended section 4.2, Ashkenazy is obligated to deliver to MBW the Promissory Note from Ashkenazy and his wife. Thus, the Purchase Agreement required nothing more in this regard than such delivery of the Promissory Note, which in fact was accomplished.

explain why MBW did not attempt to recover the unpaid portion of the purchase price from the Debtor in the state court action.

Further, the Bankruptcy Court found that MBW's theory as to why the Debtor remained liable under the Purchase Agreement was implausible. MBW contended that Ashkenazy was the primary obligor for the acquisition debt and that the Debtor, as a surety, had secondary liability for the balance of the purchase price. MBW argued that, even if the Debtor did not execute the Promissory Note, it remained liable for the purchase price as a surety and secondary obligor. MBW further contended that the Debtor was not required to report such secondary liability on its financial statements. *See* Memorandum Decision at 13–14.

The liability imposed by section 5.11 is, however, joint and several. Thus, if the Debtor were liable under section 5.11, it would be a primary obligor. The Bankruptcy Court found that the Debtor's expert witness testified credibly that if the Debtor and Ashkenazy were jointly and severally liable for the same obligation, the Debtor would be required to report the liability on its financial statements. Tr. at 131, 142–43. Secondary liability under a guaranty would also be required to be disclosed. Tr. at 143–44. The record reflects that the financial statements of the Debtor show no liability with respect to the Promissory Note. *See* Debtor Exhs. 4–8.

The Bankruptcy Court also found that, when the Amendment was executed, the Debtor had already been incorporated. The Debtor did not sign the Amendment, but the Debtor and Robbins Stores did execute collateral documents in connection with the closing. Also, the terms of the collateral agreements, such as the Arbitration Agreement and the Trademark License Agreement[9] executed at the closing, are consistent with the Bankruptcy Court's finding that the parties intended the Purchase Agreement to make Ashkenazy alone liable for the balance of purchase price represented by the Promissory Note. Given the foregoing, the Court finds that the Bankruptcy Court's findings of fact are plausible in light of the entire record. *Anderson*, 470 U.S. at 573–74, 105 S.Ct. 1504.

The Bankruptcy Court had the opportunity to observe the demeanor of the witnesses and evaluate the substance and credibility of their testimony. The Bankruptcy Court's familiarity with the issues and its assessment of the evidence presented at trial led the Bankruptcy Court to conclude that the parties intended that the Debtor would have no liability for the balance of the purchase price. Based on the record before the Court and in light of the instruction in Bankruptcy Rule 8013 that "due regard shall be given to opportunity of the bankruptcy court to judge the credibility of witnesses," the Court finds that the Bankruptcy Court's factual findings in respect of the Debtor's obligations under the Purchase Agreement are not clearly erroneous. Accordingly, the Bankruptcy Court's ruling that the Debtor is not liable for the balance of the purchase price is affirmed.

*MBW's Fraud Contentions*

 MBW contends that Ashkenazy and the Debtor defrauded MBW because they never intended to repay the balance of the purchase price. The Bankruptcy Court determined that "MBW had

9. The Arbitration Agreement, dated November 22, 1994 and the Trademark Agreement dated November 22, 1994 both refer to the Purchase Agreement as between Ashkenazy and MBW. *See* MBW Exhs. Q and R.

not articulated a theory that attributes [Ashkenazy's] fraud to the Debtor." Memorandum Decision at 18.[10] On appeal, MBW advanced the argument that the "sole actor" doctrine establishes a basis for holding the Debtor liable for Ashkenazy's purported fraud. In deciding whether to consider new arguments on appeal, the court should make such determination "with due regard to ... fairness to the parties." *In re D.G. Acquisition Corp. (D.G. Creditor Corp. v. Dabah)*, 151 F.3d 75, 82, (2d Cir.1998) (quoting *North American Leisure Corp. v. A & B Duplicators Ltd.*, 468 F.2d 695 (2d Cir.1972)). While MBW did not fully articulate its fraud argument in the proceedings below, MBW's papers in the proceedings below are replete with allegations that Ashkenazy intended to defraud MBW. Accordingly, the Court will consider MBW's fraud argument on appeal. The Court reviews the Bankruptcy Court's conclusions of law de novo and findings of fact under the clearly erroneous standard with respect to MBW's fraud claims. *In re Bonnanzio*, 91 F.3d at 300.

■■■■ The "sole actor" doctrine is an exception to the "adverse interest exception" that, under New York law, rebuts the presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir.1997) (citation omitted). Where the agent is defrauding the principal, such disclosure cannot be presumed because it would defeat—or would have defeated—the fraud. *Id.* In instances where the principal and agent are the same, the adverse interest exception is itself subject to

an exception, which is the "sole actor" doctrine. *Id.* The "sole actor" doctrine "imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." *Id.* (citing *Munroe v. Harriman*, 85 F.2d 493, 495–97 (2d Cir.1936) (knowledge of self-dealing dominant officer imputed to bank)).

■■■■ Although MBW invokes the "sole actor" doctrine to attribute Ashkenazy's fraud to the Debtor, MBW fails to articulate its application to the facts of this case. Moreover, assuming MBW had articulated properly a theory under which the Debtor would be liable for Ashkenazy's alleged fraud, establishing a claim for common law fraud under New York law requires a representation of a material fact, falsity, scienter, reliance, and injury. *See Vermeer Owners, Inc. v. Guterman*, 169 A.D.2d 442, 564 N.Y.S.2d 335 (1st Dept. 1991), *aff'd*, 78 N.Y.2d 1114, 1116, 578 N.Y.S.2d 128, 585 N.E.2d 377 (1991). In order to make out such a claim, MBW must establish the following: (1) a material false representation, (2) an intention to defraud MBW, (3) that MBW reasonably relied upon the representation, and (4) that MBW suffered damages as a result of such reliance. *See id.; Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995); *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 17 F.Supp.2d 275, 286 (S.D.N.Y. 1998).

■■■■ MBW argues that Ashkenazy and the Debtor defrauded MBW because

---

10. The Bankruptcy Court observed that, under New York law, the doctrine of reverse piercing of the corporate veil is a theory that could attribute Ashkenazy's alleged fraud to the Debtor. *See American Fuel Corp. v. Utah Energy Development Co.*, 122 F.3d 130, 134 (2d Cir.1997). Under the doctrine of reverse piercing, a corporation may be held liable if a dominant shareholder uses his position to commit a fraud. MBW did not articulate this theory.

Ashkenazy was insolvent at the time of the purchase and did not intend to pay the balance of the purchase price. The Bankruptcy Court found, however, that MBW did not produce any evidence of fraud. The Court reviews the Bankruptcy Court's factual finding that MBW did not produce evidence to support its fraud claim under the clearly erroneous standard. Fed. R.Bankr.P. 8013. Factual findings must be upheld if "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574, 105 S.Ct. 1504. On reviewing the entire record below, the Court is not "left with the definite and firm conviction that a mistake has been committed." *Metzen*, 19 F.3d at 797. Absent evidence that Ashkenazy and/or the Debtor intended to defraud MBW, MBW's fraud claim is without a factual basis.

### MBW's Other Legal Arguments

MBW made additional arguments in his appeal. To the extent these arguments raise issues of law, the Court reviews them de novo. To the extent these arguments concern the factual findings of the Bankruptcy Court, the Court reviews them under the clearly erroneous standard.

#### Promoter Liability

 MBW contends that the Debtor is liable for the balance of the purchase price under the doctrine of promoter liability. It is well settled that a corporation is not bound by pre-incorporation contracts unless it ratifies or adopts the pre-incorporation contract. *Gianino v. Panacya,* No. 00 Civ. 1584, 2000 WL 1224810, at \*7 (S.D.N.Y. Aug.29, 2000) ("a corporation is not ... generally liable for contracts between third parties and its promoters absent corporate adoption of the contract") (citations omitted); *see also In re Super Trading Co.*, 22 F.2d 480, 482 (2d Cir.1927) ("[c]ontracts entered into with the promoter of a corporation thereafter to be creat-

ed, with the intention that the corporation, when formed, shall be bound thereby, may subsequently be 'adopted' by the corporation") (citations omitted). Determining whether a corporation ratified a contract requires a factual inquiry into whether the parties intended that the corporation would be bound by the contract. *Simon v. Noma Electric Corp.*, 293 N.Y. 171, 175, 56 N.E.2d 537 (1944) (finding no proof that promoter intended to bind corporation in dealings with plaintiff). The Bankruptcy Court found that the parties intended to shield the Debtor from liability for the balance of the purchase price, and that there was no evidence that the Debtor ratified an agreement to be liable for the balance of the purchase price by its subsequent conduct. Those conclusions are not clearly erroneous. Accordingly, there is no basis for finding that the Debtor ratified or adopted any agreement to be liable for the balance of the purchase price.

#### Suretyship

 MBW contends that the Debtor is liable to MBW for the balance of the purchase price under the principles of suretyship. "When a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee, the secondary obligor is said to have suretyship status." *Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 302, 690 N.Y.S.2d 489, 712 N.E.2d 656 (1999) (citations omitted). "In other words, in transactions giving rise to suretyship status, the secondary obligor is answerable to the obligee in some way with respect to a duty, the cost of which, as between the principal obligor and the secondary obligor, ought to be borne by the principal obligor." *Id.* A suretyship may arise by operation of law in the absence of an explicit surety contract. *See Kessenich v. Raynor*, 169 F.Supp.2d 119, 122 (E.D.N.Y.2001) (citing *Chemical Bank* ). In such cases, courts

look to the "substance of the entire transaction, rather than its form" to determine if the respective roles of the parties and the nature of the underlying transaction established the existence of a suretyship.

 The Bankruptcy Court looked to the substance of the entire transaction and determined that the parties intended to shield the Debtor from any liability for the balance of the purchase price. Thus, the Bankruptcy Court's findings, which are not clearly erroneous, foreclose MBW's argument that the Debtor is bound as a surety to pay the debt owed by Ashkenazy in respect of the balance of the purchase price.

*The Landlord Reimbursement Claim*

 MBW filed claim number 159, seeking reimbursement for payments made by MBW to the Landlords subsequent to the assignment of the store leases and Robbins Stores' defaults on lease payments. During the trial, Judge Bernstein asked the parties to submit letter briefs on the issue of whether MBW had a subrogation claim with respect to this claim. *See* Tr. at 107. Argument was heard concerning the issue. *See* Tr. at 107–123. Given that the Bankruptcy Court decided as a matter of law that MBW does not have a subrogation claim, the Court reviews this determination de novo.

MBW contends that, because the Debtor operated the stores, the Debtor is the presumed assignee of the store leases and MBW became subrogated to the Landlords' rent claims against the Debtor. In its appeal brief, MBW argues that both MBW and the Debtor were primary obligors to the Landlords because MBW continued to have liability on the assigned leases and because the Debtor also assumed liability under the leases. MBW's Brief on Appeal, at 20. MBW argues that "MBW was 'paying its own' debt to landlords for rents owed by [the Debtor] on

leases. But [the Debtor's] contractual indemnity to MBW made [the Debtor] the primary obligor vis-a-vis MBW. And MBW was still [the Debtor's] surety and secondary obligor, and entitled to reimbursement by subrogation to landlords ...." *Id.*

The Purchase Agreement sets forth the respective obligations of the parties with respect to the leases. Under section 5.11 of the Purchase Agreement, the parties contemplated that Ashkenazy would organize two corporations: one that would hold the leases to the stores (Robbins Stores fulfilled this function); and one that would operate the stores (this aspect of the acquired business was undertaken by the Debtor). In addition, Ashkenazy covenanted in section 5.11 that the entities he intended to organize—the Debtor and Robbins Stores were—along with Ashkenazy, to be jointly and severally liable for the obligations under the Agreement. These obligations included the payment of rent under the store leases.

Section 5.14 provides that Ashkenazy, and the

> entities to be organized for leasing and operating the store locations, as contemplated in [s]ection 5.11 [Robbins Stores and the Debtor] shall comply with the terms of and assume all obligations under the leases assigned pursuant to this Article 5.

Purchase Agreement § 5.14. In addition, section 5.9 of the Purchase Agreement provides:

> [Ashkenazy] acknowledges that [MBW] may remain liable to the landlord under any lease assigned to [Ashkenazy], or any lease under which [MBW] subleases to [Ashkenazy], as contemplated in this Article 5. [Ashkenazy] hereby agrees to indemnify and hold [MBW] harmless against (i) any liability arising in connection therewith from the Closing Date to January 31, 1996 and (ii) any liability arising in connection therewith after

January 31, 1996, excluding, however, rent and other regular recurring charges thereunder.

Purchase Agreement § 5.9. As noted above, Ashkenazy signed the Purchase Agreement "Individually" only. The foregoing provisions thus do not obligate the Debtor directly.[11]

The Bankruptcy Court found that MBW had filed claim number 159 as a contract claim[12] and not as subrogation claim and that, moreover, there was no basis for MBW's subrogation claim. In so doing, the Bankruptcy Court found that the evidence at trial did not support MBW's contention that the Debtor was liable to the Landlords. The Bankruptcy Court cited pleadings and other legal documents proffered by MBW as evidence that Robbins Stores and not the Debtor was responsible for the obligations under the lease.[13] The Bankruptcy Court found that MBW was primarily liable for the rent under the assigned leases and that it thus could not gain subrogation rights by paying its own rent. In addition, the Bankruptcy Court found that MBW failed to offer any evidence that it in fact had paid any of the Landlords subsequent to the closing.

The Court agrees that MBW has not established a subrogation claim. Subrogation is the substitution of one party in place of another with reference to a lawful claim or right, so that the one who is substituted succeeds to the position of the other in relation to the other's claim or right. Section 509 of the Bankruptcy Code sets forth the requirements for a subrogation claim in a bankruptcy case. *In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir.1996) (section 509 is the Bankruptcy Code provision that is the statutory enactment of the doctrine of equitable subrogation). Section 509 provides, in pertinent part, as follows:

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

(b) Such entity is not subrogated to the rights of such creditor to the extent that—

(1) a claim of such entity for reimbursement or contribution on account

---

**11.** In connection with the Purchase Agreement, the parties contemplated that the Debtor would execute guaranties in favor of the Landlords. As noted above, notwithstanding MBW Exh. D, which contains a copy of a guaranty marked "specimen" that was signed by the Debtor, the Bankruptcy Court found that MBW had not offered proof that the Debtor had signed the guaranties or that the Landlords accepted the assignments. In any event, nothing in the guaranty contained in MBW Exh. D creates any direct liability on the part of the Debtor to MBW.

**12.** *See* Debtor Exh. 30.

**13.** For example, each of the Assignment and Assumption of Leases that assigned the Store Leases from MBW to Robbins Stores, Inc. (*see* MBW Exh. D) provides that Robbins Stores assumes all of MBW's obligations under the leases. *Id.* A Stipulation of Settlement among

landlord, MBW, Robbins Stores, Robbins International and Ashkenazy in the matter *RAL Realty Co. v. Robbins Stores, Inc.*, No. L & T 65244/95 (N.Y.Civ.Ct. Queens Cty.) provided that Robbins Stores was the "actual and sole tenant," and that Robbins Stores was responsible for all of the obligations under the lease, and further that the Debtor "is not the tenant and is only an operating entity in possession of the subject premises." *See* ¶ 10 of the Settlement Agreement, MBW Exh. L. In other litigation over the leases, a state court found that "nothing in the record establishes that [the Debtor] was a tenant or otherwise in occupancy in the premises." *See Sutton Shopping Center, Inc. v. Robbins MBW Corp.*, Index No. 72248/95, slip op. at second unnumbered page (N.Y.Civ.Ct. Kings Cty. Oct. 2, 1995).

of such payment of such creditor's claim is—

(A) allowed under section 502 of this title; or

(B) disallowed other than under section 502(e) of this title; or

(C) subordinated under section 510 of this title; or

(2) as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.

11 U.S.C.A. § 509 (West 2002). It is well settled that one who makes a payment that is the primary obligation of the payor, as distinguished from a payment of the debt of another, is not entitled to subrogation. *In re Wingspread Corporation, et al. (Pandora Industries, Inc. v. Paramount Communications Inc.)*, 145 B.R. 784, 789 (S.D.N.Y.1992) (citations omitted).

As noted above, there was no evidence that the Debtor undertook liability for the lease obligations. The Purchase Agreement, with its indemnification provision, was signed by Ashkenazy "Individually" only and the Bankruptcy Court found that MBW did not offer evidence establishing that the Debtor signed the guaranties or that the Landlords consented to the assignments.

In addition, the Bankruptcy Court, citing pleadings and other papers relating to litigation involving the leases, determined that the evidence established that Robbins Stores, as the store tenant, was responsible for rent payments under the leases. Thus, to the extent MBW paid rent on the leases, such payments were made as a co-debtor with respect to Robbins Stores.

MBW cites *In re Wingspread Corporation, et al.*, 145 B.R. 784 (S.D.N.Y.1992), in support of its argument that it is entitled to subrogation to the extent it made rent payments on the store leases. *Wingspread*, however, does not support MBW's claim. Analysis of that case is instructive.

In *Wingspread*, a subsidiary of Paramount Communications ("Paramount") had entered into certain leases. Paramount had executed guaranties of the leases. The subsidiary ultimately assigned its interest in the lease to the debtor, but the assignments provided that the assignor continued to be liable for rent under the leases. Paramount assumed the liabilities of its subsidiary, including the liabilities under the leases, when it subsequently sold all the stock of its subsidiaries. Upon the debtor's bankruptcy filing, Paramount agreed to advance funds to the lessor to cover the debtor's rent obligations. During the course of the bankruptcy, the debtors sought to assume the executory lease agreements and assign them to a third party, Pandora Industries, Inc. Paramount contended in litigation over the assignment that it was entitled to be subrogated to the lessor's rights against the debtor on account of the funds it had advanced to the lessor.

On appeal, the district court determined that Paramount's liability on the leases did not preclude its subrogation to the lessor's claim. *Id.* at 790. The court recognized that "[a]n essential prerequisite to the right of equitable subrogation is that the person seeking subrogation must have made a payment of *another's* obligation." *Id.* at 789. In analyzing whether, for subrogation purposes, Paramount had made a payment of the debtor's obligation and not its own, the district court stated:

the relevant question in the subrogation context is not simply whether the party was directly liable, but rather whether its payment was used to satisfy *another's* obligation. The question is sometimes conceived as one of "ultimate" liability—a question that can be answered by determining which of the liable parties received the consideration.

*Id.* at 790. The district court determined that, although both Paramount and the

debtor were liable under the leases, the debtor-assignee had ultimate liability under the leases because it was the entity receiving the consideration in the form of occupancy. *Id.*

Under these principles, and consistent with the Bankruptcy Court's findings, Robbins Stores and not the Debtor is the ultimate obligor because there is no evidence that the Debtor assumed contractual liability for the lease obligations and Robbins Stores, to which the leases were assigned, was the party receiving the consideration. Any rent payments made by MBW to the Landlords thus were made on behalf of Robbins Stores and not the Debtor. Accordingly, MBW fails to meet the requirements of section 509 of the Bankruptcy Code and is not entitled to reimbursement from the Debtor's estate for rents paid under the leases.

*CONCLUSION*

In light of the foregoing, the decision of the Bankruptcy Court expunging MBW's claims 158 and 159 is affirmed.