Douglas FAULKNER, et al., Plaintiffs,

v.

NATIONAL GEOGRAPHIC SOCIETY, et al., Defendants.

Fred Ward, et ano., Plaintiffs,

v.

The National Geographic Society, et al., Defendants.

David Hiser, et al., Plaintiffs,

v.

National Geographic Society, et al., Defendants.

Louis Psihoyos, et al., Plaintiffs,

v.

The National Geographic Society, et al., Defendants.

No. 97 Civ. 9361(LAK), 99 Civ. 12385(LAK), 99 Civ. 12488(LAK), 02 Civ. 6623(LAK).

United States District Court, S.D. New York.

Dec. 11, 2003.

See also 211 F.Supp.2d 450, 220 F.Supp.2d 237, and 208 F.Supp.2d 429.

Andrew Berger, Tannenbaum, Helpern, Syracuse & Hirschtritt, LLP, for Plaintiffs in No. 99 Civ. 12385.

Richard F. Schaden, David Katzman, Danial Alan Nelson, Schaden, Katzman, Lampert & McClune, for Plaintiffs Psihoyos, Rickman, Austen and Matrix Int'l, Inc., in No. 97 Civ. 9361 and for Plaintiffs in No. 02 Civ. 6623.

Stephen A. Weingrad, Kimberly C. Turina, Weingrad & Weingrad, LLP, for Plaintiff Douglas Faulkner in No. 97 Civ. 9361 and for Plaintiffs in No. 99 Civ. 12488.

Robert G. Sugarman, Naomi Jane Gray, Pierre M. Davis, Weil, Gotshal & Manges LLP, for Defendants.

Terrence B. Adamson, National Geographic Society, for Defendants National Geographic Society, National Geographic Holdings, and National Geographic Enterprises, Inc.

## OPINION

KAPLAN, District Judge.

The digital revolution has caused substantial growing pains in the law of copyright as the law has sought to adapt to the demands of a new age. This case is yet another example.

Plaintiffs here are freelance photographers or writers who created images or text that originally appeared in the print version of the *National Geographic Magazine* (the *"Magazine"*). While the ownership of the copyrights in their creations in many cases is disputed, all agree that defendant National Geographic Society ("NGS") had the right to publish their works in the *Magazine* regardless of who owns the copyrights.

In the late 1990's, defendants produced and began to market various editions of "The Complete National Geographic" (the "CNG"), a digital archive of all past issues of the *Magazine* on CD–ROM and DVD. Plaintiffs here claim that the production and sale of the CNG infringed their copyrights in and otherwise violated their rights with respect to their contributions to the *Magazine*. The fundamental questions, common to all of the cases, are whether the NGS, as owner of the copyrights in the individual issues of the *Magazine*, is privileged by Section 201(c) of the Copyright Act of 1976 (the "1976 Act") [1] to market the CNG on the theory that it is a reproduction or revision of the *Magazine* and whether NGS is foreclosed from reliance on Section 201(c) by a previous adverse decision in the Eleventh Circuit.

The matter now is before the Court on defendants' motions for partial summary judgment dismissing the copyright infringement and certain other claims and motions by many of the plaintiffs for partial summary judgment determining that defendants are liable for copyright infringement under the 1976 Act. [2]

### Facts

#### Parties

All of the plaintiffs save two [3] are freelance photographers or writers who created images or wrote text that appeared in the *Magazine*.

The principal defendants are NGS and two of its subsidiaries, National Geo-

---

**1.** 17 U.S.C. § 201(c).

**2.** The Court previously decided motions for partial summary judgment dismissing those aspects of the complaints in Nos. 97 Civ. 9361 and 99 Civ. 12385 that were brought under the Copyright Act of 1909 ("1909 Act"), which concerned photographs and text that appeared in the *Magazine* before 1978 (the "Pre–1978 Works"), and the Digital Millennium Copyright Act ("DMCA"). *Faulkner v. Nat'l Geographic Soc'y*, 211 F.Supp.2d 450, *mod. on reconsideration*, 220 F.Supp.2d 237 (S.D.N.Y.2002); *Ward v. Nat'l Geographic Soc'y*, 208 F.Supp.2d 429 (S.D.N.Y.2002).

**3.** The two exceptions are Matrix International, Inc. ("Matrix"), and Sally Faulkner. Sally Faulkner is the assignee of the copyrights in ten photographs taken by her former husband. Matrix is a plaintiff in two actions. In No. 97 Civ. 9361, it purports to sue on behalf of two freelance photographers. In No. 02 Civ. 6623, Matrix claims to have licensed photographs to defendants for use in the *Magazine*.

Plaintiffs in No. 99 Civ. 12488 assert in their moving papers that David Allen is suing on behalf of himself and his father whose successor in interest he claims to be. This Court previously dismissed Allen's claims as successor in interest to his father. *Faulkner v. Nat'l Geographic Soc'y*, 211 F.Supp.2d 450, *mod.*

graphic Ventures, Inc. ("NGV"), and National Geographic Enterprises, Inc. ("NGE"), now known as National Geographic Holdings, Inc. NGS is the world's largest nonprofit scientific and educational organization, with approximately ten million members worldwide. In 1995, NGS placed its television and, subsequently, its interactive and a portion of its cartography divisions into NGV, a wholly-owned taxable subsidiary. NGV in turn wholly owns NGE, among the divisions of which is National Geographic Interactive ("NGI").[4]

The *Magazine* is the monthly official journal of NGS, published in print format since 1888. In December 1996, NGS granted NGV the nonexclusive right to use photographs and text included in the archive of the *Magazine* ("in archival form only, without manipulation or alteration") for the development and distribution of various multimedia products.[5]

Defendant Mindscape, Inc. is a computer software publisher and distributor. In September 1996, it entered into an agreement with NGE through its division, NGI, whereby Mindscape would manufacture, market, and distribute CD–ROM products created by NGS, including the CNG.[6] The agreement granted Mindscape the sole and exclusive right to manufacture, reproduce, and distribute certain multimedia products, including the CNG, based on an archive of the *Magazine*.[7] In return, Mindscape granted NGI the right to receive royalties on its sales of the CNG and other related multimedia products.[8]

Defendant Dataware Technologies, Inc., now known as LeadingSide, Inc. ("Dataware"),[9] is a developer of interactive software for the purpose of information retrieval and electronic publishing applications. In August 1996, Ledge Multimedia, then a division of Dataware, entered into an agreement with NGS, the purpose of which was for Dataware to manage the development of the CNG archive.[10] The agreement required Dataware to develop a custom CD–ROM template, including integration of a custom set of interfaces to display magazine

---

on reconsideration, 220 F.Supp.2d 237 (S.D.N.Y.2002)

4. Fahey Decl. (*Ward* docket item ["DI"] 60) ¶¶ 2, 4.

Mr. Fahey submitted declarations supporting each of defendants' three motions. The declarations supporting the motions in *Ward* and *Faulkner/Hiser* are identical. (Although the latter was docketed in both cases, it has been assigned an item number only on the *Faulkner* docket sheet.) The declaration supporting the motion to dismiss in *Psihoyos* is substantially identical to the other two. To the extent the three are identical, all citations are to the declaration in *Ward* alone. Parallel citations to the declaration in *Psihoyos* are included where it differs from the others.

5. Plaintiffs' Exhibits in Support of Motion and in Opposition to Defendants' Motions ("Pl. Supp. & Opp. Ex.") (*Faulkner* DI 79) Ex. B 408–40 & attach. B.

6. Encore, Inc. ("Encore") succeeded Mindscape as the manufacturer and distributor of the CNG in 2001. *See* Berger Aff. (*Ward* DI 62) ¶ 33 & Ex. 71.

7. Fahey Decl. (*Ward* DI 60) ¶ 16 & Ex. J ¶¶ 1, 2; Fahey Decl. (*Psihoyos* DI 5) ¶ 19 & Ex. J ¶¶ 1, 2.

8. Fahey Decl. (*Ward* DI 60) Ex. J ¶ 5; Def. Revised 56.1 St. (*Psihoyos* DI 12) ¶ 22; Def. 56.1 St. (*Ward* DI 60) ¶ 19; Def. 56.1 St. (*Faulkner* DI 74) ¶ 19.

9. Dataware is in bankruptcy in a case pending in the District of Massachusetts. *In re LeadingSide, Inc.*, No. 01 B 12876 (D. Mass. Bankr.filed Apr. 1, 2001). This action therefore is stayed as against it except in limited respects not germane here. It does not join in the motion by the other defendants.

10. Fahey Decl. (*Ward* DI 60) ¶ 17 & Ex. K; Fahey Decl. (*Psihoyos* DI 5) ¶ 20 & Ex. K; Def. 56.1 St. (*Ward* DI 60) ¶ 25; Def. 56.1 St. (*Faulkner* DI 74) ¶ 25.

pages, a search engine and JPEG[11] images of the scanned magazine pages. After completing this process, Dataware shipped the prototype CD–ROMs to Mindscape at its California offices for reproduction and mass distribution.[12]

In October 1997, defendant Eastman Kodak Company ("Kodak")[13] entered into a co-sponsorship agreement with NGI, Mindscape and Dataware pursuant to which Kodak would pay a fee to NGI for placement of a Kodak promotional message at the beginning of CNG CD–ROMs and advertising on the product package. It received 5,000 complimentary units of the first of the CNG collections, received no revenue or other remuneration from the CNG products, had no right to control their content, and did not participate in their marketing or distribution save for whatever disposition it made of the 5,000 copies it received.[14]

*The Complete National Geographic*

In 1996, NGS developed a proposal to reproduce all issues of the *Magazine* published between 1888 and 1996 in CD–ROM format. The product, now known as the CNG, was produced in significant part through a process of digital scanning. Each issue of the *Magazine* published between 1888 and 1996 was scanned, page by

page, into a computer system. The pages were scanned two at a time, so that a user of CNG is presented with the exact same visual experience as if reading from the print version of the *Magazine*.[15] Defendants assert that the scanning process created an "exact image-based reproduction" of each page as it appeared in the *Magazine*.[16]

For reasons that will become apparent, some of the plaintiffs contend that the CNG is not a precise digital image of the *Magazine*. Several contend that they compared some print issues of the *Magazine* with the CNG version and found differences with respect to some advertisements.[17] Plaintiffs in No. 02 Civ. 6623 and plaintiffs Psihoyos, Rickman, Austen and Matrix (the "Psihoyos Plaintiffs") in Nos. 97 Civ. 9361 and 99 Civ. 12488 claim also that certain special editions of the *Magazine* are missing from one of the CD–ROM products and that certain of their images were blacked out in later versions of the CNG.[18] None of these contentions, however, is sufficient to raise a genuine issue of material fact as to the proposition that the CNG in fact is a virtually exact image-based reproduction of the pages of the *Magazine*[19] in which the issues of the *Magazine* appear chronologically, from the

---

11. "JPEG" is short for Joint Photographic Experts Group and is pronounced "jay-peg." It is a compression technique for digital color images, which can reduce file sizes to about 5 percent of their normal size. Some detail is lost in the compression. *Wĕbop‑edia,* at <http://www.pcwebopedia.com/TERM/J/JPEG.html> (last visited Dec. 3, 2003).

12. Fahey Decl. (*Ward* DI 60) ¶ 17; Fahey Decl. (*Psihoyos* DI 5) ¶ 20.

13. Kodak is a defendant in Nos. 97 Civ. 9361 and 99 Civ. 12488 only.

14. Fahey Decl. (*Psihoyos* DI 5) ¶¶ 31–33.

15. Fahey Decl. (*Psihoyos* DI 11) ¶ 9.

16. Fahey Decl. (*Ward* DI 60) ¶¶ 7–9.

17. Ward Reply Aff. (*Ward* DI 66) ¶¶ 3–10; Pl. Opp. Mem. (*Ward* DI 65) 2; *see* Psihoyos Pl. Opp. 56.1 St. ¶ 11 & attach. Psihoyos Decl. ¶¶ 26–27; Pl. 56.1 St. (*Psihoyos* DI 14) ¶ 22 & attach Psihoyos Decl. ¶¶ 25–27.

18. Psihoyos Decl., Psihoyos Pl. Opp. Mem. in *Faulkner/Hiser* (hereinafter "Psihoyos Decl. (*Faulkner/Hiser*)") ¶ 13, 25; Psihoyos Decl. (*Psihoyos* DI 14) ¶ 13, 25.

19. The differences that some of the plaintiffs observed between advertisements and format as they appeared in the particular print issues they compared to the CNG are attributable to the fact that the *Magazine* is published in

earliest at the beginning of the first disk to the latest at the end of the thirtieth disk.

"The Complete National Geographic: 108 Years of National Geographic Magazine on CD–ROM" ("CD–ROM 108"), which was introduced to the marketplace in 1997, has three components. The first is a multimedia sequence that displays NGS's logo followed by a promotional message for Kodak and a sequence depicting the covers of ten issues of the *Magazine* that transition from one into another (the "Moving Cover Sequence"). The multimedia sequence plays on the first time a user boots up CD–ROM 108 and at the beginning of each subsequent session. In subsequent sessions, however, the user can skip the sequence by clicking on the logo once. The second component, referred to in this opinion as the Replica, consists of the digital reproduction of the pages and issues of the *Magazine*. The third is the computer software that serves as the storage repository and retrieval system for the *Magazine* images.[20]

Since 1997, the NGS has published additional CNG products, principally CD–ROMs and DVDs for the first 109, 110, 111 and 112 years of the *Magazine*.[21] These products have varied slightly from the first with respect to the introductory sequences, which display the NGS's logo, and the Kodak promotional message. Only the 108 and 109 year CD–ROMs contained the Moving Cover Sequence. Beginning with the 110 year product, each version has contained a very short summary of each article that appears on the list of "hits" generated by the search engine in response to user queries.[22] Capabilities have

regional editions in which the advertising content and format varies to some degree. Def. Reply Mem. (*Ward* DI 71) 11 & n. 12 and materials there cited; *compare* Ward Reply Aff. (*Ward* DI 66) Ex. 83 *with* Def. Reply Mem.App. (*Ward* DI 71) Ex. 27. Ward has come forward with no evidence that the portion of the CNG that consists of images of *Magazine* pages is not a precise reproduction of one of these regional advertising editions of the *Magazine*.

Approximately 60 images were blacked out in certain editions of the CNG because an issue arose as to whether the NGS had the right to include a limited number of images in consequence of explicit contractual language excluding electronic reproduction. Fahey Decl. (*Ward* DI 60) ¶ 13 n. 4; Fahey Decl. (*Psihoyos* DI 5) ¶¶ 15 n. 8, 25. There is no suggestion that any images by plaintiffs were blacked out or, for that matter, that any of the blacked out images originally appeared in print in proximity to any text or images created by them except that the *Psihoyos* Plaintiffs contend that three photographs allegedly licensed by plaintiff Matrix were blacked out and replaced with a notice reading "image not available." Psihoyos Decl. (*Psihoyos* DI 14) ¶ 13; Psihoyos Decl. (*Faulkner/Hiser*) ¶ 13. As plaintiffs cannot claim infringement based on the *failure* to include those photographs in the CNG, the blacking out of those three images is immaterial. So too is the blacking

out of the other 57 images, as they do not materially alter the context in which any of the plaintiffs' works appear in the CNG. Likewise, the failure to include images of certain special editions in the CNG does not alter the fact that the plaintiffs' works that are included in the CNG appear in exactly the same contexts in which they appeared in print.

**20.** Fahey Decl. (*Ward* DI 60) ¶¶ 10–11 & Ex. A; Fahey Decl. (*Psihoyos* DI 5) ¶¶ 11–12 & Ex. A; Stanton Decl. (*Ward* DI 71) ¶ 2.

The search engine produces a list of stories in response to the user's query and identifies, for each story listed, its title, author, date, and related subjects. Fahey Decl. (*Ward* DI 60) ¶ 10 n. 2; Fahey Decl. (*Psihoyos* DI 5) ¶ 11 n. 6.

**21.** Fahey Decl. (*Ward* DI 60) ¶ 12; Fahey Decl. (*Psihoyos* DI 5) ¶ 14; *see also* Def. 56.1 St. (*Psihoyos* DI 12) ¶ 28.

It published also decade sets, which contain Replicas of the *Magazine* for various decades, and "The Complete National Geographic" Curriculum Supplement. Fahey Decl. (*Ward* DI 60) ¶ 14; Fahey Decl. (*Psihoyos* DI 5) ¶ 16.

**22.** Fahey Decl. (*Ward* DI 60) ¶¶ 10 n. 2, 13 & n. 3; Fahey Decl. (*Psihoyos* DI 5) ¶¶ 11 n. 6, 15 & n. 7.

been added to the software.[23] All, however, contain a Replica section.

### Discussion

#### I. The Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[24] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[25] In that event, the nonmoving party must come forward with admissible evidence[26] sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[27]

A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."[28]

#### II. Copyright Infringement

##### A. Section 201(c)—Revision or Reproduction

Section 201(c) of the 1976 Act provides:

"Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective

23. Additions to CNG 110 and its later iterations include: (a) an introductory tutorial, (b) new interactive software tools, such as a tool to darken text for easier reading and another tool to rotate images, (c) bookmarking capabilities, and (d) a search and save feature. *See e.g.,* Pl. Opp. 56.1 St. (*Ward* DI 66) ¶ 14; Wells Decl. (*Psihoyos* DI 14) ?21; Pl. Joint Reply 56.1 St. (*Faulkner* DI 87) ¶ 10. Other software capabilities not available in the *Magazine* include the ability to print digital pages and links to the NGS website. *See e.g.,* Pl. Opp. Mem. (*Faulkner* DI 85) 7–8; Pl. Opp. Mem. (*Ward* DI 65) 4–5; Pl. Opp. Mem. (*Psihoyos* DI 14) 7–8; Pl. SJ Mem. (*Faulkner* DI 77) 7–8; *compare* Pl. Joint 56.1 St. (*Faulkner* DI 78) ¶ 79–10, *with* Def. Opp. 56.1 St. (*Faulkner* DI 86) ¶ 79–10.

24. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.,* 221 F.3d 293, 300 (2d Cir.2000); *see also* FED. R. CIV. P. 56(c).

25. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Virgin At. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001).

26. *See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123–24 (2d Cir.2001); *id.,* 164 F.3d 736, 746 (2d Cir. 1998); *Raskin v. Wyatt Co.,* 125 F.3d 55, 65–66 (2d Cir.1997):

27. *E.g., Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when nonmoving party bears burden of proof at trial, moving party is entitled to summary judgment if nonmovant fails to make showing on essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548).

28. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (quoting *Schwabenbauer v. Bd. of Ed.,* 667 F.2d 305, 313–14 (2d Cir.1981) (internal citations omitted)).

work, and any later collective work in the same series."[29]

It thus distinguishes between the "[c]opyright in each separate contribution to a collective work" and the "copyright in the collective work as a whole." The former "vests initially in the author of the contribution." The owner of the copyright in the collective work, barring an express transfer, is presumed to have acquired from the owner of the copyright in each separate contribution only the privilege of "reproducing and distributing the contribution as part of [1] that particular collective work, [2] any revision of that collective work, and [3] any later collective work in the same series."

The parties agree that NGS acquired from the plaintiffs at least the right to publish their contributions in the *Magazine*.[30] Defendants contend that the CNG is a "reproduction" or "revision" of the *Magazine* and, in consequence, that the infringement claims must be dismissed. Plaintiffs, for their part, maintain that NGS litigated and lost precisely this argu-

---

**29.** 17 U.S.C. § 201(c).

**30.** All plaintiffs so admitted in response to the first round of summary judgment motions. Def. 56.1 St. (*Faulkner* DI 33) ¶ 4; Pl. 56.1 St. (*Faulkner* DI 40) ¶ 4; Def. 56.1 St. (*Ward* DI 27) ¶ 4; Pl. 56.1 St. (*Ward* DI 36) ¶ 4. Defendants repeated this assertion in their Rule 56.1 statements in the present round of summary judgment motions. Def. 56.1 St. (*Ward* DI 60) ¶ 4; Def. 56.1 St. (*Faulkner* DI 74) ¶ 4; Def. Revised 56.1 St. (*Psihoyos* DI 12) ¶ 32. Ward in substance objected to this assertion in No. 99 Civ. 12385 (Pl. 56.1 St. (*Ward* DI 66) ¶ 4), but testified at his deposition that he granted one time publication rights to NGS with respect to the use of his works in the *Magazine*. *See, e.g.,* Def.App. SJ Motion (*Ward* DI 60) Ex. O at 48:1–14, 65:21–66:11. Thus, there is no genuine issue as to the fact that plaintiffs all granted NGS at least one time publication rights with respect to all of the works at issue in this case. Certain plaintiffs in *Faulkner, Hiser* and *Psihoyos* claim, however, that they granted one time publication rights only with respect to print media and specifically excluded electronic productions.

In *Psihoyos*, plaintiffs' papers in opposition to defendants' motion for summary judgment asserted that plaintiff Psihoyos in certain instances gave NGS only rights so limited, referring to plaintiffs' Exhibit 17 and Psihoyos' declaration in opposition to the motion. Pl. Opp. Mem. (*Psihoyos* DI 14) 47; Psihoyos Decl. (*Psihoyos* DI 14) ¶ 11; Plaintiffs' Exhibits in Opposition to Motion to Dismiss ("Pl. Opp. Ex.") (*Psihoyos* DI 15) Ex. 17. Defendants thereupon withdrew so much of their motion in that case as sought dismissal of Psihoyos' infringement claims with respect to those photographs. Def. Reply Mem. (*Psihoyos* DI 18) 18 n. 33. Exhibit 17 in support of plaintiffs' opposition memorandum contains evidence which conceivably might support his claim of a limited grant with respect to only two photographs: (1) a photograph of Paul Sereno, and (2) a photograph of a Ford Styrofoam mockup that appeared in the October 1995 issue. Pl. Opp. Ex. (*Psihoyos* DI 15) Ex. 17.

Certain of the plaintiffs in *Faulkner* and *Hiser* who are represented by the Weingrad firm (others have their own counsel) claimed in papers in support of their own motion for summary judgment that the rights granted by them to NGS were similarly limited. Pl. SJ Mem. (*Faulkner* DI 77) 21. The only evidentiary basis for this claim consists of affidavits and declarations by plaintiffs stating that they did not intend to grant any rights with respect to electronic media. Of course, statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract. *E.g., Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir. 1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *In re Robbins Int'l, Inc.,* 275 B.R. 456, 465 (S.D.N.Y.2002); *Bayer Corp. v. Chestnut Acq. Corp.,* 189 F.Supp.2d 153, 157 (S.D.N.Y.2002); *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 301–02 (S.D.N.Y. 1997); *see Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1003 (2d Cir.1974). Hence, these assertions must be disregarded. What remains, therefore, is the concession that all of the plaintiffs granted at least one-time publication rights—a concession that accords with the industry custom, *see, e.g., Ward,* 208 F.Supp.2d at 438–39.

ment in *Greenberg v. National Geographic Society*[31] and that defendants therefore are collaterally estopped from relying on Section 201(c).

### 1. Collateral Estoppel

 "Litigants who have had a full and fair opportunity to litigate ordinarily will not be heard to relitigate an issue actually, finally and necessarily decided against them in a prior action."[32] To prevail on a claim of collateral estoppel, or issue preclusion, the party asserting the estoppel must show that:

"(1) the issues in both proceedings are *identical,* (2) the issue in the prior proceeding was *actually litigated and actually decided,* (3) there was a *full and fair opportunity to litigate* in the prior proceeding, and (4) the issue previously litigated was *necessary* to support a *valid* and *final judgment* on the merits."[33]

It therefore is necessary to begin by considering the *Greenberg* case.

### a. The Greenberg case

The CNG contains (1) a multimedia opening sequence, those in the 108 and 109 year products depicting actual covers of past issues of the *Magazine,* (2) the Replica, consisting of digitally reproduced images of the *Magazines* themselves, and (3) the computer software that is the storage repository and retrieval system for the images.[34]

The plaintiff in *Greenberg* was a freelancer much like those here. His photographs appeared in various issues of the *Magazine* that were incorporated in the CNG. One of his photographs appeared also in the Moving Cover Sequence.[35] He sued NGS for copyright infringement based on a claim that the rights he had granted for publication in the *Magazine* did not permit use of his work in the CNG. The defendants argued in the district court that the CNG "constitute[d] a 'revision' of that collective work [i.e., the *Magazine* ] within the meaning of 17 U.S.C. § 201(c)" and that publication of the CNG therefore did not infringe the plaintiff's copyright.[36] The district court agreed, holding that the CNG was a "revision" within the meaning of the statute.[37]

The Eleventh Circuit reversed. It assumed, but did not decide, that Section "201(c)'s revision privilege embrace[d] the entirety of the Replica portion of the CNG"[38]—i.e., the images of the *Magazine* issues themselves—but went on to note that the animated opening sequence and the software were independently copyrightable elements not present in the *Magazine.* It therefore reasoned that "common-sense copyright analysis compels the conclusion that the Society, in collaboration with Mindscape, has created a new product ('an original work of authorship'), in a new medium, for a new market that far transcends any privilege of revision or other mere reproduction envisioned in § 201(c)."[39] It concluded that the NGS,

---

**31.** 244 F.3d 1267 (11th Cir.) (corrected opinion), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001) (mem.).

**32.** *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 239 (S.D.N.Y.1997).

**33.** *Carney v. Philippone,* 332 F.3d 163, 170 (2d Cir.2003) (internal quotation marks omitted) (emphasis added); *accord, Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987) (setting out four-part test).

**34.** *E.g., Greenberg,* 244 F.3d at 1269–70.

**35.** There is no suggestion that any of the plaintiffs' photographs in these cases appeared in the Moving Cover Sequence.

**36.** *Greenberg v. Nat'l Geographic Soc'y,* 97–3924–CIV (Lenard), 1998 U.S. Dist. LEXIS 18060, at *6 (S.D.Fla. May 14, 1998).

**37.** *Id.* at *10.

**38.** *Greenberg,* 244 F.3d at 1272.

**39.** *Id.* at 1273.

by "creating a new work ... forfeited any privilege that it *might* have enjoyed with respect to" a mere transformation of the print version of the *Magazine* into a digital form.[40]

### b. Identity of Issues

In considering whether the issues presented in *Greenberg* and in this case are identical, it is important at the outset to note that Greenberg claimed infringement with respect to the use of one of his photographs in the Moving Cover Sequence as well as with respect to the inclusion of his other photographs in the Replica portion of the CNG. As there is no suggestion that any of plaintiffs' material was used in the Moving Cover Sequence, their claims parallel only the second of Greenberg's contentions.

At first blush, that issue—whether Section 201(c) permits defendants to include plaintiffs' material in the Replica portion, assuming for the sake of argument that plaintiffs retain copyright in their individual contributions—seems the same as that in *Greenberg*. Defendants, however, contend that (1) the issues are not identical and, in any case, (2) *Greenberg* should not be given preclusive effect in light of the Supreme Court's subsequent decision in *New York Times, Inc. v. Tasini*,[41] because they lacked a full and fair opportunity to litigate the relevant issue in *Greenberg*[42] and for other reasons.

### (1) Reproduction

The first question is whether defendants' contention that the CNG is a "reproduction" of the *Magazine* under Section 201(c) was litigated and necessarily decided in *Greenberg*.

There is language in the Eleventh Circuit's opinion to the effect that the CNG is neither a revision *nor* a reproduction of the *Magazine* for Section 201(c) purposes. The district court opinion, however, stated that defendants relied upon the revision prong of Section 201(c) and dealt only with that issue.[43] There is no suggestion that defendants argued that the CNG is a reproduction. Thus, notwithstanding the language in the circuit's opinion, it is not clear whether the reproduction question actually was litigated, let alone necessarily decided.[44] Nevertheless, in view of the

---

**40.** *Id.* at 1274 (emphasis in original).

**41.** 533 U.S. 483, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001).

**42.** *E.g., Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 480–81, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ("[T]he judicially created doctrine of collateral estoppel does not apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue."); *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (holding that "the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case."); *Montana v. United States,* 440 U.S. 147, 164 n. 11, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."); *Epperson v. Entm't Express, Inc.,* 242 F.3d 100, 108 (2d Cir.2001) ("Because the issue ... was not actually litigated and actually decided in the first action, plaintiffs are not barred by collateral estoppel from raising it in the second action.").

**43.** *Greenberg,* 1998 U.S. Dist. LEXIS 18060, at *6.

**44.** Although certain plaintiffs in *Faulkner* and *Hiser* assert that defendants invoked Section 201(c)'s reproduction and revision provisions before the Eleventh Circuit, *see* Psihoyos Pl. Opp. Mem. (*Faulkner/Hiser*) 15 (citing *Greenberg,* 244 F.3d at 1272), the Eleventh Circuit's opinion describes defendants as arguing only whether "its use of Greenberg's photographs constitutes a 'revision' of the *Magazine.*" *Greenberg,* 244 F.3d at 1272.

discussion that follows it is unnecessary to decide whether defendants are foreclosed on their reproduction argument.

### (2) Revision

The next question is whether the "revision" issue decided in *Greenberg* is identical to that tendered here.

Defendants argued in the district court in *Greenberg* that the CNG "constitutes a 'revision' of that collective work [i.e., the *Magazine*] within the meaning of 17 U.S.C. § 201(c)."[45] The district court agreed.[46] The Eleventh Circuit rejected that argument.[47] The identity of the revision issue in *Greenberg* and this case is evident. Accordingly, defendants are foreclosed from asserting that the CNG is a "revision" permitted by Section 201(c) unless there is some other basis for declining to accord *Greenberg* preclusive effect. Defendants make a number of arguments, but it is necessary to deal only with one.

### c. The Effect of Tasini

The Supreme Court has held that "a judicial declaration intervening between ... two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable."[48] Defendants contend that the Supreme Court's decision in *Tasini*, which postdated *Greenberg*, had precisely this effect.

*Tasini* was an infringement suit by freelance authors based upon the inclusion of their contributions to earlier collective works in three products: LEXIS/NEXIS, New York Times OnDisc ("NYTO"), and General Periodicals OnDisc ("GPO"). LEXIS/NEXIS is a searchable online database that displays, outside of their original contexts, the text of individual articles from hundreds of publications. NYTO and GPO both are searchable CD–ROM databases. NYTO identifies and displays the texts of articles from *The New York Times*. Like LEXIS/NEXIS, it presents articles out of their original context. GPO is an image-based product that reproduces articles from approximately two hundred publications, including *The New York Times* Sunday book reviews and Magazine. Unlike an article displayed by LEXIS/NEXIS and NYTO, a GPO article appears "exactly as it appeared on printed pages, complete with photographs, captions, advertisements, and other surrounding materials."[49] A GPO article, however, appears "without any material published on other pages of the original periodical."[50]

The *Tasini* defendants contended that the three databases at issue were "revisions" of the collective works and thus that their publication was permitted by Section 201(c). The Supreme Court, however, determined that a key factor was how the articles are "presented to, and perceptible by, the user of the Databases."[51] In other words, "the question is not whether a user can generate a revision of a collective work from a database, but whether the database itself perceptibly presents the author's contribution as part of a revision of the collective work."[52] In the course of its

---

45. *Greenberg,* 1998 U.S. Dist. LEXIS 18060, at *6.

46. *Id.* at *10.

47. *Greenberg,* 244 F.3d at 1273.

48. *Comm'r of Internal Revenue v. Sunnen,* 333 U.S. 591, 600, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (citing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 290 (2d Cir.2000) (*"Res judicata* and collateral estoppel do not cement the *status quo* into perpetuity.").

49. *Tasini,* 533 U.S. at 491, 121 S.Ct. 2381.

50. *Id.* at 500, 121 S.Ct. 2381.

51. *Id.* at 499, 121 S.Ct. 2381.

52. *Id.* at 504, 121 S.Ct. 2381.

analysis, the Court considered the analogies, pressed by the defendants, of microfilm and microfiche, noting:

"Microforms typically contain continuous photographic reproductions of a periodical in the medium of miniaturized film. Accordingly, articles appear on the microforms, writ very small, in precisely the position in which the articles appeared in the newspaper.... True, the microfilm roll contains multiple editions, and the microfilm user can adjust the machine lens to focus only on the Article, to the exclusion of surrounding material. Nonetheless, the user first encounters the Article in context. In the Databases, by contrast, the Articles appear disconnected from their original context."[53]

It ultimately concluded that "the databases reproduce and distribute articles *standing alone and not in context,* not 'as part of that particular collective work' to which the author contributed, 'as part of ... any revision' thereof, or 'as part of ... any later collective work in the same series.' "[54] Accordingly, it rejected the defendants' Section 201(c) argument.[55]

The defendants here suggest that *Tasini* made clear what the *Greenberg* panel, in their view, misunderstood: as long as an individual work appears in its original context, the resulting product qualifies as a permissible reproduction or revision of a collective work under Section 201(c). They press the microform analogy, arguing that the CNG is precisely the kind of product evidently envisioned by the Court as being consistent with the rights possessed by the holder of a copyright in a collective work under Section 201(c). The question pertinent to the collateral estoppel issue, however, is whether *Tasini* so altered the environment as to warrant a fresh look at the Section 201(c) revision issue in this case.

At the outset, it is important to recognize that plaintiffs here seek to employ non-mutual offensive collateral estoppel— that is, they wish to use offensively against defendants a judgment in a case to which plaintiffs were not parties. This variant of the doctrine was not sanctioned by the Supreme Court until 1979, which even then recognized that the justifications for collateral estoppel in this setting are not as strong as in cases in which the prior judgment is used defensively.[56] Indeed, it concluded "that the preferable approach for dealing with these problems ... is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied."[57]

■ In exercising this discretion, a court naturally must consider the extent to

---

53. *Id.* at 501, 121 S.Ct. 2381.

54. *Id.* at 488, 121 S.Ct. 2381 (emphasis added).

55. *Id.*

The factual basis for this conclusion with respect to LEXIS/NEXIS and NYTO was self evident—each of those services displayed only the text of the articles divorced even from the rest of the pages on which the articles first appeared. Although GPO was an image-based product in which the articles appeared as they did in print, the material published on pages before and after those containing the search-identified articles were not displayed when viewing those articles. The Court reasoned that whether an article appears as a text-based file through LEXIS/NEXIS or NYTO, or as an image-based replica through GPO, "we cannot see how the Database perceptibly reproduces and distributes the article 'as part of' either the original edition or a 'revision' of that edition." *Id.* at 500, 121 S.Ct. 2381.

56. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–31, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

57. *Id.* at 331, 99 S.Ct. 645.

which nonmutual offensive collateral estoppel would serve the ends that gave rise to the doctrine. Collateral estoppel serves primarily two purposes. It protects "litigants from the burden of relitigating an identical issue with the same party or his privy and [it] promot[es] judicial economy by preventing needless litigation." [58] In the offensive nonmutual setting, however, the first of these purposes is not served at all.[59] Plaintiffs, for example, have not previously litigated the Section 201(c) issue. They have no interest in repose or reliance that warrants protection. They have no right to benefit from the prior decision except to the extent that it is persuasive. The justification, if justification there be, for applying the doctrine here would be only to prevent defendants from imposing unduly on judicial resources by relitigating the issue they lost in *Greenberg.*

█ As the characteristics of the CNG have not changed in any material way, the issue in this case is one of law or, at least, the application of law to undisputed facts. Defendants thus are not asking the Court to revisit a question that initially required a perhaps complex factual determination, a situation in which the concern for judicial economy is especially strong. This of course is not to say that there is no interest in precluding relitigation of essentially legal issues. But that interest is served also "by the more flexible rule of *stare decisis.*" [60] So the matter comes down to whether the benefit gained by foreclosing relitigation of such a question is outweighed by any benefits of allowing it, subject of course to an obligation to give to

the prior decision such weight as its persuasive force commands in the present legal environment. The existence of that obligation mitigates the burden of relitigating the legal questions and suggests that the extent to which the subsequent developments must have changed the environment need not be especially great to justify a fresh look at such an issue.

The authorities bear this out, especially in the context of this case. The Second Circuit has adopted the rule of the Restatement, viz. that preclusion is inappropriate, even as between the same parties, where "a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws." [61] Where preclusion is sought on behalf of a stranger to the prior litigation—i.e., in the case of nonmutual offensive use—the Restatement goes even further. It regards preclusion in such cases as inappropriate also if "[t]he issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based" or if "other compelling circumstances make it appropriate that the party be permitted to relitigate the issue." [62]

To be sure, much of this language is so general as to provide limited guidance for deciding specific cases. But the comments flesh it out. Comment i to Section 29 indicates that "the rule of preclusion should ordinarily be superseded by ... *stare decisis*" where the issue may be ap-

---

**58.** *Id.* at 326, 99 S.Ct. 645.

**59.** *See id.* at 326–27, 99 S.Ct. 645; *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 433–34 (2d Cir.1995).

**60.** RESTATEMENT (SECOND) OF JUDGMENTS § 29 cmt. i (1982) (hereinafter RESTATEMENT).

**61.** *Haitian Centers Council v. McNary,* 969 F.2d 1350, 1356 (2d Cir.1992) (quoting RESTATEMENT § 28(2)(b)) (internal quotation marks omitted), *rev'd on other grounds sub nom. Sale v. Haitian Centers Council,* 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993).

**62.** RESTATEMENT §§ 29(7)–29(8).

pealed to an appellate court of jurisdiction coordinate to that which rendered the prior decision or where "the issue is of general interest and has not been resolved by the highest appellate court that can resolve it." [63] Comment b to Section 28 states that another consideration relevant to whether issue preclusion should be applied is whether "application of the rule ... would impose on one of the parties a significant disadvantage, or confer on him a significant benefit, with respect to his competitors." [64]

Both of these considerations are pertinent here. The issue tendered by defendants—whether the CNG is a "revision" within the contemplation of Section 201(c)—requires construction of the 1976 Act in a new technological context. The question is whether a print publisher of a collective work is privileged to use the individual contributions in a digital version where (a) the individual contributions are presented in the same contexts in which they appeared in print, and (b) the digital version contains also software or other materials that did not appear in the print version. This issue is one of substantial importance to the development of copyright law and to its impact on the dissemination of knowledge. The Second Circuit, to which any appeal here would be taken, of course is a jurisdiction coordinate to that of the Eleventh Circuit. In the event of a circuit conflict, the matter likely would go to the Supreme Court. A decision on the merits here thus would promote the development of the law on this important point.[65]

Nor should the commercial interest of the defendants be ignored. The NGS is not the only publisher of collective works that has published, or yet may publish, a digital archive of its print publications. The NGS's competitors are free to challenge the rule announced in *Greenberg* and, if successful, would be entitled to bring out digital versions without obtaining

---

63. *Id.* § 29 cmt. i.

64. *Id.* § 28 cmt. b.

65. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 173, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984), not cited by the parties, does not suggest otherwise. In *Stauffer*, the government had litigated and lost the question at issue in a suit in the Tenth Circuit against Stauffer Chemical. Subsequently, the government prevailed on precisely the same issue in a case against a different defendant in the Ninth Circuit. It then sought to relitigate the question against Stauffer in a third proceeding, this one on the Sixth Circuit. The Supreme Court, however, held that the government was collaterally estopped as against Stauffer Chemical. It rejected the government's contention that such a ruling was unwarranted in view of the intervening Ninth Circuit decision, stating that there was no reason to allow the government "to litigate twice with the same party an issue arising in both cases from virtually identical facts" and that an exception to the doctrine of collateral estoppel "in this case would substantially frustrate the doctrine's purpose of protecting litigants from burdensome relitigation and of promoting judicial economy." *Id.* at 172, 104 S.Ct. 575.

This case is quite different. First, *Stauffer*, unlike this case, involved defensive mutual collateral estoppel, as the government was attempting to relitigate the same issue against the same party. The interest in repose that undergirded the Supreme Court's decision is absent here. Second, any change in the legal environment in *Stauffer* was considerably less significant than that in this case. The intervening development was merely a conflicting decision in another circuit, a reasonably common occurrence that ordinarily is resolved over time by Supreme Court resolution of the conflict. Here, in contrast, the subsequent development is a Supreme Court decision that suggests a substantial difference in approach from that adopted by the *Greenberg* court. Applying collateral estoppel here would deprive the Supreme Court of the benefit of the views of another circuit and thus retard or, perhaps, prevent the development of the law in this important area.

additional rights from any holders of copyright in individual contributions to the print versions of their collective works. Should that occur, and if the NGS were foreclosed by collateral estoppel from relitigating the issue decided in *Greenberg,* the NGS would be placed at a disadvantage with respect to its competitors. It would be blocked from proceeding with the CNG absent the purchase of additional rights from individual authors and photographers while its competitors would face no such hurdle.

These considerations support the view that the extent to which the legal terrain must have been changed by *Tasini* to warrant reexamination of *Greenberg* is modest. Indeed, one leading commentator has said that "Supreme Court clarification of issues that had been debated or uncertain in the lower courts is ... a proper justification for avoiding preclusion" [66] and that "mere general growth of a body of law may defeat preclusion, although care should be taken lest insufficient 'changes' of 'law' defeat preclusion by simply allowing reconsideration of a point once lost." [67] But it is unnecessary to rely on the broadest of these statements, as the change

worked by *Tasini* was substantial by any measure.

*Greenberg* resolved the revision issue by looking to the question whether the CNG contained independently copyrightable elements in addition to the previously published collective works, i.e., the *Magazine. Tasini* took a different approach. It focused instead on whether the individual contributions appeared in the putative revisions—the electronic databases—in the same contexts in which they appeared in the original collective works. Moreover, its reference to the microform analogy has significant implications for the CNG. Accordingly, while it perhaps is possible, as a matter of formal logic, to reconcile the holdings of *Tasini* and *Greenberg,* [68] the difference in the Supreme Court's approach to the revision issue nonetheless is striking. [69]

The Psihoyos Plaintiffs argue that this difference in approach is insufficient to justify a refusal to apply collateral estoppel here, relying principally on three Second Circuit cases, Staten Island Rapid Transit Operating Auth. v. ICC [70] ("SIRTOA"), NLRB v. United Technologies Corp. [71] and *Zdanok v. Glidden Co.* [72] But *SIRTOA* favors defendants here, [73] and

66. 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 4425, at 675 (2002); *see also Minnis v. United States Dep't of Agriculture,* 737 F.2d 784, 786 n. 1 (9th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985).

67. 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 4425, at 677–79.

68. It is logically possible that *both* the absence of independently copyrightable additions and the presentation of the individual contributions in the contexts in which they first appeared are indispensable to revision status under Section 201(c)

69. *See e.g.,* Amir A. Naini, *New York Times Co. v. Tasini,* 17 BERK. TECH. L.J. 9, 20–21 (2002)

(absence of discussion of presence of copyrightable software component in § 201(c) analysis "notable" and suggests that "it is comparatively less important to a section 201(c) analysis" than indicated in *Greenberg* ).

70. 718 F.2d 533 (2d Cir.1983).

71. 706 F.2d 1254 (2d Cir.1983).

72. 327 F.2d 944 (2d Cir.1964).

73. In *SIRTOA,* the Staten Island Rapid Transit Operating Authority in 1974 obtained a state court anti-strike injunction under the Taylor Law. The state court then held that SIRTOA was an intrastate carrier and thus subject to state rather than federal law. In 1978, the union brought actions claiming that SIRTOA was subject to the Railway Labor Act ("RLA") and that the Taylor Law was

*United Technologies* and *Zdanok* do not go nearly as far as these plaintiffs would have it.[74]

This Court is convinced, both as a matter of law and in the exercise of discretion, that application of collateral estoppel to foreclose defendants from asserting that the CNG is a privileged revision of the *Magazine* would disserve the public interest in having the important issue presented here resolved definitively and would be inequitable. It therefore holds that defendants are not foreclosed on the revision issue by *Greenberg*.

### 2. The Merits

Section 201(c) creates a privilege in the publisher of a collective work for "reproduction" of "that particular collective work, any revision of that collective work, and any later collective work in the same series" but does not define any of those terms. The phrase "that particular collective work" obviously includes "a specific edition or issue of a periodical."[75] The meaning of the remaining terms, however, is far from self evident.

■ Where, as here, the language of the statute is unclear, resort to legislative his-

---

preempted. The district court abstained in favor of the Interstate Commerce Commission ("ICC"), which held that SIRTOA was a "carrier" and therefore subject to the RLA. The district court then adopted the ICC decision and granted the union's motion for summary judgment.

On appeal, the employer contended that the union was collaterally estopped by the state court judgment and that its claim should have been dismissed. But the Second Circuit rejected the argument on the ground, *inter alia*, that the ICC decision was an intervening change or special circumstance warranting an exception to the normal rules of preclusion. *SIRTOA* thus supports the view that *Tasini* warrants a fresh look at the Section 201(c) issue. Indeed, the case for making an exception to the normal rule of preclusion was even weaker in *SIRTOA* than here because the parties there were substantially the same. SIRTOA, having previously litigated the issue with the union in the state court, had a reliance interest in the enforcement of the state court judgment that the plaintiffs here lack.

**74.** In *United Technologies*, the Second Circuit held that the NLRB was collaterally estopped by a prior Second Circuit decision, which had held lawful the enforcement of a company rule barring solicitation on company premises during working hours, to attack the same rule as an unfair labor practice. The NLRB contended that an intervening Supreme Court decision had so changed the atmosphere as to reopen the issue. But the Court of Appeals rejected the argument on the grounds that (1)

the Supreme Court's decision focused on "the interplay between two factors—neither of which was at issue in" the prior Second Circuit decision, and (2) there was no indication that the Supreme Court had intended to deal with the issue then before the Court of Appeals. 706 F.2d at 1263–64. *United Technologies* therefore does not compel the conclusion that *Tasini* did not make a substantial change in the legal environment relevant here when it held that the relevant focus in determining whether a subsequent collective work is a "revision" is on the context in which original contributions appear as distinguished from whether the putative "revision" contains independently copyrightable material.

The Psihoyos Plaintiffs rely also on *Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir.1964), for the proposition that doubt about the validity of a prior ruling does not justify the refusal to apply collateral estoppel. Pl. Opp. Mem. (*Psihoyos* DI 14) 23–24. The general principle of course is correct. But *Zdanok* was a much weaker case for reexamining a prior holding. Among other factors, the intervening decision relied upon as changing the legal environment was another Court of Appeals decision, not a Supreme Court ruling. *Zdanok*, 327 F.2d at 950–53. Moreover, the prior decision had been rendered by a different Second Circuit panel. Reexamination therefore would have implicated concerns for inter-panel consistency and *en banc* procedure that are not present here.

**75.** *Tasini v. New York Times Co.*, 206 F.3d 161, 167 (2d Cir.2000), *aff'd*, 533 U.S. 483, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001).

tory is appropriate.[76] The most pertinent indication is in the House Judiciary Committee Report, which states in relevant part:

> "Under the language of this clause a publishing company could reprint a contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of an encyclopedia in a 1990 revision of it; the publisher could not revise the contribution itself or include it in a new anthology or an entirely different magazine or other collective work." [77]

A staff report expressed much the same idea, stating that the privilege did not permit "inclusion of [an author's] contribution in anthologies or other entirely different works." [78]

These comments are instructive. The use of the term "entirely different" to describe a new work not privileged by Section 201(c) suggests that the privilege extends to a collective work that is merely somewhat different from the original in which the contribution appeared. This view is supported strongly by the Judiciary Committee's encyclopedia revision example. An encyclopedia typically is a collective work consisting of individual articles dealing with the various subjects treated. As time goes by, some articles become outdated and new subjects come into being. A revised edition of an encyclopedia thus would contain some articles that have been revised to take account of new learning and some entirely new articles, as well as some articles in precisely their original forms. Each revised and new article would be copyrightable independently. Hence, *Greenberg*'s holding—that the presence of independently copyrightable material is inconsistent with a conclusion that the CNG is a "revision" of the print versions of the *Magazine*—cannot be reconciled with the legislative history. Indeed, it "defies the very legislative history" upon which the Eleventh Circuit relied.[79]

What then distinguishes a "revision" from an "entirely different" work? As the Supreme Court noted in *Tasini*, Section 201(c) was a compromise intended "to adjust the balance between" freelancers and publishers so that "[i]f there is demand for a freelance [work] standing alone or in a new collection, the Copyright Act allows the freelancer to benefit from that de-

---

76. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir.2002).

77. H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 122–23 (1976), *reprinted in* 5 U.S.C.C.A.N. 5659, 5738 (1976).

78. *Staff of the House Comm. on the Judiciary*, 89th Cong., 1st Sess., Copyright Law Revision, Part 6: Supplementary Report of the Registrar of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill (Comm. Print 1965) at 69 ("Supplementary Report").

79. Jennifer L. Livingston, Casenote, *Digital "Revision": Greenberg v. National Geographic Society*, 70 U. Cin. L.Rev. 1419, 1429–32 (2002) (hereinafter *"Digital 'Revision' "* ).

Plaintiff Ward relies for a contrary conclusion on a letter from the Register of Copyright written in 2001, twenty-five years after the enactment of the 1976 Act, in which the Register contended that the interpretation of Section 201(c) advanced in *Tasini* by the publishers was incorrect and unintended by Congress. Pl. Opp. Mem. (*Ward* DI 65) 8–9 & Ex. 108. But that is not the issue here, as *Tasini*, unlike this case, involved the disassembly of the original collective works, following which the individual contributions were made available out of the contexts in which they had appeared. Moreover, plaintiff ignores the passage from the same letter discussed *infra*, which strongly suggests that the CNG is a revision within the meaning of Section 201(c).

mand."[80] In determining whether the freelancer's work is part of a new collection as distinguished from a revision, the focus is on the manner in which it is "presented to, and perceptible by, the user."[81] A critical consideration is whether the original contribution is presented in the same context in which it appeared in the initial collective work, at least to such an extent that the new product "perceptibly presents the author's contribution as part of a revision of the collective work."[82] As the Register of Copyright wrote in a letter discussing Tasini:

> "The legislative history of § 201(c) supports this conclusion [i.e., that the NEXIS database at issue in Tasini was not a revision]. It offers, as examples of a revision of a collective work, an evening edition of a newspaper or a later edition of an encyclopedia. *These examples retain elements that are consistent and recognizable from the original collective work so that a relationship between the original and the revision is apparent. Unlike NEXIS, they are recognizable as revisions of the originals.* But as the Second Circuit noted, all that is left of the original collective works in the databases involved in Tasini are the authors' contributions.

> "It is clear that the databases involved in Tasini constitute, in the words of the legislative history, 'new,' 'entirely different' or 'other' works. *No elements of arrangement or coordination of the pre-existing materials contained in the databases provide evidence of any similarity or relationship to the original collective works to indicate they are revisions.*"[83]

In this case, with a few immaterial exceptions, each issue of a regional edition of the *Magazine* was scanned, page by page, into a computer system, creating an exact image of each and every page as it appeared in that edition of the *Magazine*. There are no changes to the content, format or appearance of the issues of the *Magazine* reproduced in the CNG. Each page of each issue appears to the user exactly as it was in the scanned print version of the *Magazine*, including all text, images, advertising and attributions. The issues of the *Magazine* appear chronologically, from the earliest at the beginning of the first CD to the latest at the end of the last. Pages may be viewed only as they appeared in the print versions of the *Magazine*.[84] The material, once it is accessed via the software, is "presented to, and perceptible by, the user" precisely as it appeared in print. In this respect, therefore, it is precisely comparable to the microforms to which the Supreme Court referred approvingly in *Tasini*.[85] It certainly contains "elements

80. *Tasini*, 533 U.S. at 497, 121 S.Ct. 2381.

81. *Id.* at 499, 121 S.Ct. 2381.

82. *Id.* at 504, 121 S.Ct. 2381.

83. 147 Cong Rec., E182–02, E183 (daily ed. Feb. 14, 2001) (emphasis added).

84. Fahey Decl. (*Ward* DI 60) ¶ 9; Fahey Decl. (*Psihoyos* DI 5) ¶ 9–10.

85. The *Psihoyos* Plaintiffs argue that the CNG is not a revision under Section 201(c) because the original collective work in each case is the particular issue of the *Magazine* in which their works first appeared, not a collection of the 1,285 issues that appear in the CNG. In consequence, they contend, the CNG cannot be a revision of "that particular collective work," i.e., a particular issue of the *Magazine* in which their work appeared. Pl. Opp. Mem. (*Psihoyos* DI 14) 37–38; Psihoyos Pl. Opp. Mem. (*Faulkner/Hiser*) 37–38. In *Tasini*, however, the Supreme Court strongly suggested that this argument lacks merit when it indicated that *The New York Times* probably was entitled to include in its microfilm edition an article first published in a particular daily print number of the newspaper, despite the fact that "the microfilm roll contains multiple editions, and the microfilm user can adjust the machine lens to focus only on the Article, to the exclusion of the surrounding material," because "the user first encounters the Article

that are consistent and recognizable from" the *Magazine* "so that a relationship between the original and the [CNG] is apparent."

Plaintiffs nevertheless resist the conclusion that the CNG is a reproduction or revision of the *Magazine.* While the arguments overlap and are somewhat diffuse, they boil down to two points:

- The CNG contains material that never appeared in the *Magazine*—not only the animated opening sequence and music, Kodak advertisements, and in some editions a summary of each article and a closing montage, but software tools including a search engine with advanced search capabilities, save, print and bookmark features, and a hyperlink to NGS's Internet web site.

- The software tools provide the user with an opportunity to have a media experience in using the CNG that is different from simply reading print pages.[86]

As the foregoing discussion indicates, the first of these contentions is without merit. Congress quite clearly intended that the Section 201(c) revision privilege extend to collective works which, like the revision of an encyclopedia, contain original contributions along with new or updated material. Thus, the fact that the CNG contains elements that did not appear in the print editions of the *Magazine* is insufficient to foreclose Section 201(c) protection.[87]

■ Plaintiffs' second argument is evocative of the Eleventh Circuit's suggestion that the CNG is "a new product ('an original work of authorship'), in a new medium, for a new market" and thus not protected by Section 201(c).[88] That suggestion itself is largely unpersuasive. Every revision is an original work of authorship and therefore a new product, yet each is protected by Section 201(c). The fact that this product appears in a new medium makes no difference, in and of itself, as media neutrality is a fundamental principle of the Copyright Act.[89] So what remains is the

---

in context." 533 U.S. at 501, 121 S.Ct. 2381. The same is true of the CNG, and this Court finds the Supreme Court's analysis, although it is *dictum,* persuasive.

**86.** Pl. Opp. Mem. (*Ward* DI 65) 6–8; Pl. SJ Mem. (*Ward* DI 64) 27–28; Pl. Opp. Mem. (*Faulkner* DI 85) 7–9; Pl. Opp. Mem. (*Psihoyos* DI 14) 33–36; Pl. SJ Mem. (*Faulkner* DI 77) 7–8.

**87.** By parity of reason, plaintiff Ward's contention that the bundling of some CNG products with computer hardware products takes the CNG out of the protection of Section 201(c), *see* Pl. SJ Mem. (*Ward* DI 64) 28, is without merit.

**88.** 244 F.3d at 1273.

**89.** *E.g., Tasini,* 533 U.S. at 501–02, 121 S.Ct. 2381 (transfer of work between media does not alter its character for copyright purposes); Mark B. Radefeld, Note, *The Medium is the Message: Copyright Law Confronts the Information Age in* New York Times v. Tasini, 36 Akron L. Rev. 545, 571–72 (2003); Michael A.

Forhan, Note, Tasini v. New York Times: *The Write Stuff for Copyright Law?* 27 Cap. U.L.Rev 863, 867 (1999).

The legislative history only "confirms the fundamental principle of medium [sic] neutrality which is the bedrock of the 1976 Act." Def. Mem. (*Psihoyos* DI 11) 16. Indeed, as defendants point out, testimony in hearings before the House Committee on the Judiciary evidences an intent for Section 201(c) to encompass future technology. As George Cary of the Copyright Office stated in response to a question from Representative Kastenmeier about whether the revisions to the Copyright Law could accommodate future technologies, "[y]ou can read the bill from beginning to end and you won't find in it any reference to computers … Yet these are one of the coming instruments of communication in the future. We have tried to phrase the broad rights granted in such a way that they can be adapted as time goes on to each of the new advancing media. This is our hope." *Hearing on H.R. 4347, H.R. 5680, H.R. 6831, H.R. 6835 Before the House Comm. on the Judicia-*

contention that the user experience with the CNG—its easy searchability and other attractive software-dependent features—is so different from that with the *Magazine* itself that the CNG should be regarded as an "entirely different" work.[90]

It is difficult to see why this should take the CNG out of Section 201(c). The predominant differences between the *Magazine* and the CNG are the CNG's convenient physical "package" and the software that provides easy searchability, i.e., the animated opening sequence and other such material and the search engine, respectively. Such technological advances have occurred before. Hard as it may be, from a twenty-first century vantage point, to regard the binding of individual issues of periodicals into more convenient stiff backed volumes and the addition of printed indices as technological advances, that is what they were – stiff bindings improved the physical characteristics of the periodicals, and indices are search engines that improved their searchability. Yet no one here suggests that the NGS's bound volumes and its addition of indices infringe

the copyrights of individual contributors. And the obvious common sense of that reticence applies to the CNG as well. In each case, the material fact is that the content of the product, whether the CNG or the indexed bound volumes, that users wish to see is identical to the original print versions, the individual issues of the *Magazine*. In each case, the content that motivates purchasers is the underlying collective work for which the plaintiffs granted rights. The fact that more purchasers may be interested because the package is more attractive than a library full of more than 112 years of monthly copies of the *Magazine* is immaterial.[91]

As the Supreme Court said in *Tasini*, the accommodation struck by Section 201(c) was to allow a freelancer to benefit where "there is demand for a freelance article standing alone or in a new collection."[92] But the CNG is not a new collection. Nor is it, in words the House Judiciary Committee used to articulate the limits of the Section 201(c) privilege, "a new anthology or an entirely different magazine or other collective work."[93]

ry, Copyright Law Revision, 89th Cong., 1st Sess. at 57 (1965).

**90.** Plaintiffs in No. 02 Civ. 6623 rely on *Random House, Inc. v. Rosetta Books LLC*, 150 F.Supp.2d 613 (S.D.N.Y.2001), *aff'd*, 283 F.3d 490 (2d Cir.2002) for the proposition that the interactive nature of the CNG takes the product out of the protection of Section 201(c). Pl. Opp. Mem. (*Psihoyos* DI 14) 40–41. *Rosetta* simply does not stand for that proposition.

The passage quoted by plaintiffs in their brief comes from a passage in which the Court holds that e-books are a different medium than print books, distinguishing the case from "new use" cases within the same media. *Rosetta*, 150 F.Supp.2d at 622–23. It is not disputed here that CNG is a different medium than the *Magazine*. Regardless, the case at bar is distinguishable from *Rosetta*, as the latter was a contract case focusing on licensing contracts and not copyright ownership under Section 201(c).

**91.** So too is another of plaintiffs' contentions, viz. that images and text may be "cut" from a digital CNG "page" and electronically "pasted" into another file or text. *See, e.g.*, Pl. Opp. 56.1 St. (*Ward* DI 66) ¶ 11; Pl. Joint Reply 56.1 St. (*Faulkner* DI 87) ¶ 11; Psihoyos Decl. (*Psihoyos* DI 14) ¶¶ 28–31. The same could be said of the *Magazine*. A user of a print copy of the *Magazine* could physically cut an image from the issue and paste it elsewhere, or reproduce it by photography or electronic scanning. But all of this is beside the point. What is significant is that the plaintiffs' works appear in the CNG in the same context in which they appeared in print, not that a user could remove them from that context by manipulating the storage medium.

**92.** *Tasini*, 533 U.S. at 497, 121 S.Ct. 2381.

**93.** H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 123 *reprinted in* 5 1976 U.S.C.C.A.N. 5659, 5738 (1976).

Rather, it is a package that contains substantially everything that made the *Magazine* copyrightable as a collective work – the same original collection of individual contributions, arranged in the same way, with each presented in the same context. It is readily recognizable as a variation of the original. Accordingly, the Court holds that the CNG is a revision of the individual print issues of the *Magazine*; it respectfully disagrees with so much of *Greenberg* as held otherwise.[94]

### B. Effect of Section 201(c) on Pre–1978 Works

The Court's previous opinions determined that the NGS owned copyright in some of the Pre–1978 Works while issues of fact exist concerning ownership of others. NGS argues, however, that these issues are immaterial because Section 201(c) protects the use of the Pre–1978 Works in the CNG.

█ As the Second Circuit said in *Roth v. Pritikin*,[95] "[w]hoever holds an interest in copyright on or after January 1, 1978, has a right to the protections afforded by the new statute [i.e., the 1976 Act], al-though the creative work may previously have been governed by the 1909 Act or the common law." In other words, the 1976 Act does not "purport to determine who holds a copyright for works created before January 1978. It merely clarifies the rights of individuals owning copyrights on that date, whomever [*sic* ] they may be." [96]

The NGS at all relevant times owned copyrights in issues of the *Magazine* published before and after January 1, 1978. In consequence, the privileges conferred upon it by Section 201(c) as the holder of those copyrights govern regardless of when they were published. Accordingly, to whatever extent that Section 201(c) protects publication of the CNG, it does so regardless of whether the NGS or plaintiffs own the copyrights in plaintiffs' individual contributions. Indeed, plaintiffs do not dispute this point.[97]

### C. The Right of NGS and NGE to Invoke Section 201(c)

A number of plaintiffs, but not all, contend that defendants may not invoke Section 201(c) because the copyrights in the collective works, the issues of the *Magazine*, are owned by an entity other than the creator of the CNG.[98] In addition, all

---

**94.** As no work of any plaintiff here appears in the Moving Cover Sequence, this Court expresses no opinion as to whether such use would come within the Section 201(c) privilege. *See Digitial "Revision,"* 70 U. Cinn. L.Rev. at 1432–33 (§ 201(c) privilege not "an 'all or nothing' scheme under which a collective work is either entirely infringing or entirely privileged").

**95.** 710 F.2d 934, 938 (2d Cir.1983).

**96.** *Id.*

**97.** This Court previously determined, in ruling on motions addressed exclusively to issues under the Copyright Act of 1909, that plaintiff Fred Ward owned the copyright in a photograph of President Kennedy that appeared in a November 1966 *Magazine* story, "The Living White House," and stated that Ward was entitled to partial summary judg-ment as to liability for infringement by virtue of its inclusion in the CNG. *Ward,* 208 F.Supp.2d at 448–51. As the prior motions dealt only with ownership of copyright under the 1909 Act, the effect of Section 201(c) was not then before the Court. The summary judgment ruling with respect to infringement of his copyright in this photograph was premature. Given the present holding that Section 201(c) authorized the National Geographic defendants to publish the CNG, Ward is not entitled to judgment with respect to that photograph notwithstanding his continued ownership of the copyright in it.

**98.** Pl. Opp. Mem. (*Ward* DI 65) 13–20; Pl. SJ Mem. (*Faulkner* DI 77) 9–13. Plaintiffs' motion for summary judgment in Nos. 97 Civ. 9361 and 99 Civ. 12488 was on behalf of some, but not all, plaintiffs in those two actions, in particular those represented by the firm of Weingrad & Weingrad, LLP.

plaintiffs argue that the NGS's transfer to them of the copyrights in some of the contributions terminated any privilege it had under Section 201(c).[99]

### 1. NG Interactive and Mindscape

■ Certain plaintiffs argue that the revision privilege of Section 201(c) is conferred only on the owner of the copyright in the original collective work, that the CNG was not created by that owner, and that the Section 201(c) privilege therefore does not apply here. Defendants rejoin that NGS's privilege under Section 201(c) is transferable both to its subsidiary, NGI, and to Mindscape.[100] Thus, the Court must address two issues: (1) whether NGI, as a wholly-owned subsidiary of the owner of the copyright in the collective works, is entitled to avail itself of the Section 201(c) privilege, and (2) whether NGS, through its subsidiary NGI, was entitled to license that privilege to Mindscape, for manufacturing and distribution purposes.

#### a. NGI

As a purely formal matter, there is, as these plaintiffs contend, a separation of the ownership of the copyrights in the collective works and the creator of the CNG. NGS, a not-for-profit entity, owns the copyrights in the issues of the *Magazine*. It licensed its wholly-owned subsidiary, NGV, to use those works. The CNG was created by Interactive, a division of a wholly-owned subsidiary of NGV, NGE.

But the substance was different. Counsel to the NGS supervised the clearing of necessary rights and obtaining legal advice with respect to NGS's right to create the CNG.[101] NGS's board of trustees was kept informed of the project and ultimately had the power to disapprove the release of the product if it so desired.[102] Thus, the NGS owned the entire beneficial interest in and controlled the product.

Corporations of course are legal entities. In many circumstances, particularly those relating to the question whether their stockholders are personally responsible for their liabilities, the corporate form is respected absent extraordinary circumstances.[103] In construing statutes and contracts, perhaps among other situations, however, courts often focus on economic substance rather than form in order to give effect to the intent of the legislature or the contracting parties.

*Sexton v. Nelson* [104] is a good example. A California appellate court there upheld the transfer of a lease that contained an anti-assignment clause from a parent corporation to a wholly-owned subsidiary on the ground that the transfer was "merely ... a change in the legal form of a business and [did] not affect the interests of the party protected by the nonassignable provisions of the [contract]." [105]

The intra-enterprise conspiracy doctrine provides another example. Section 1 of the Sherman Act [106] prohibits contracts, combi-

99. Pl. SJ Mem. (*Ward* DI 64) 23–26; Pl. SJ Mem. (*Faulkner* DI 77) 17–18; Psihoyos Pl. Opp. Mem. (*Faulkner/Hiser*) 47–48; Pl. Opp. Mem. (*Psihoyos* DI 14) 46.

100. Def. SJ Mem. (*Psihoyos* DI 11) 24; Def. Opp. Mem. (*Faulkner* DI 88) 16.

101. Def. Rep. Mem. (*Faulkner* DI 90; *Hiser* DI 44; *Ward* DI 71) Ex. O–17A, at 65–66 (Dupre Dep., Sept. 26, 2000).

102. *Id.* Ex. O–21A, at 121–22 (Fahey Dep., Oct. 6, 2000).

103. *E.g., Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1052–53 (2d Cir.1997).

104. 228 Cal.App.2d 248, 39 Cal.Rptr. 407 (1964).

105. 228 Cal.App.2d at 259, 39 Cal.Rptr. at 413.

106. 15 U.S.C. § 1.

nations and conspiracies in restraint of trade. Strict regard to the corporate form would compel the conclusion that a parent corporation is legally capable of conspiring with its wholly-owned subsidiary. But the Supreme Court has rejected this formalistic view, holding that "the coordinated activity of a parent and its wholly-owned subsidiary must be viewed as that of a single enterprise" and, in consequence, that they are incapable as a matter of law of forming a conspiracy.[107] The Second Circuit has extended this principle to the civil rights laws, holding that a cooperative apartment corporation and its directors are incapable of forming a conspiracy under 42 U.S.C. § 1985(3).[108]

Congress was well aware of the often complex corporate structures of media and publishing enterprises.[109] Nevertheless, plaintiffs have drawn the Court's attention to nothing in the language or legislative history of the Act that suggests that Congress intended to attach any significance for purposes of Section 201(c) to whether a putative revision put out by a part of a particular media group is published by the same corporate entity that owns the copyright in the collective work. Acceptance of plaintiffs' argument thus would alter the balance that Congress struck by attaching legal significance to a purely formal matter that does not affect any legitimate substantive interest of the authors.

In view of NGS's beneficial ownership of and control of the subsidiaries here in question, they all are parts of the same economic enterprise. They are indistinguishable for purposes of Section 201(c).

### b. Transferability of the Section 201(c) Privilege

Assuming *arguendo* that the separation within the National Geographic group between the ownership of the copyrights in the *Magazine* and the production of the CNG is inconsequential for Section 201(c) purposes, several plaintiffs nevertheless argue that the licensing of Mindscape to manufacture, reproduce and distribute the CNG was impermissible under the statute because NGS's privilege to use the individual contributions to the *Magazine* was not transferable. They liken the Section 201(c) privilege to a nonexclusive license, which is not transferable.[110]

The only court to deal with this particular issue, the district court in *Tasini*, rejected the very same argument. Judge Sotomayor there looked to the language of the statute itself and the legislative history to conclude that the Section 201(c) privilege may be transferred or licensed.[111]

107. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

108. *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *see also Johnson v. Nyack Hosp.*, 954 F.Supp. 717 (S.D.N.Y.1997) (hospital incapable of conspiring with its own officials).

109. *See Hearing on H.R. 4347, H.R. 5680, H.R. 6831, H.R. 6835 Before the House Comm. on the Judiciary*, Copyright Law Revision, 89th Cong., 1st Sess. (1965) (statements of Burton Lane, president of American Guild of Authors & Composers, and Hayward Cirker, president of Dover Publications).

110. Pl. Opp. Mem. (*Ward* DI 65) 17; *see also* Pl. SJ Mem (*Faulkner* DI 77) 10 ("a nonexclusive license does not transfer any rights of ownership … and cannot [be] assign[ed] … to a third-party without the consent of the copyright owner").

111. *Tasini v. New York Times Co.*, 972 F.Supp. 804, 815–16 (S.D.N.Y.1997), *rev'd on other grounds*, 206 F.3d 161 (2d Cir.2000), *aff'd*, 533 U.S. 483, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001). Neither the Second Circuit nor the Supreme Court ruled on the transferability of the Section 201(c) privilege. The Supreme Court stated that "we neither decide nor express any view on whether the § 201(c) 'privilege' may be transferred." *Tasini*, 533 U.S. at 496 n. 5, 121 S.Ct. 2381.

This Court agrees. No purpose would be served by repeating that analysis.[112]

Accordingly, the Mindscape license does not deprive defendants of the protection of Section 201(c).

### 2. The Copyright Transfers

NGS transferred to certain of the plaintiffs the copyrights it owned in at least some of the articles and photographs in question. Plaintiffs contend that these transfers conveyed to them whatever revision rights otherwise NGS otherwise might have had and, in consequence, that defendants have no privilege under Section 201(c). The argument, however, is based on a fundamental misreading of the statute.

■ Section 201(c) presumptively confers the privilege of reproducing the separate contributions in reproductions, revisions, and later collective works in the same series on the owner of the copyright in the collective work "[i]n the absence of an express transfer of the copyright or of any rights under it." [113] The privilege is a component of the copyright in the collective work, not the copyrights in the individual contributions included in the collective work. The transfer of copyrights in an original contribution therefore does not affect the privilege of the owner of the copyright in the collective work. Plaintiffs' argument is entirely without merit.

### D. Contributory Infringement

The claims against Kodak and Mindscape are for contributory infringement.[114] To the extent that the alleged copyright infringement claims fail, plaintiffs cannot prevail on their contributory infringement claims.[115] Accordingly, the claims against Kodak and Mindscape will be dismissed *pari passu.*

### E. The Poster

■ In 1988, the NGS created a poster to celebrate its centennial that was given to employees, friends of the Society, and as a free gift to purchasers of another NGS publication but never sold. It depicted all covers of the *Magazine* from 1960 forward and certain representative covers predating 1960.[116] The poster thus included cover photographs corresponding to three of Ward's stories, albeit greatly reduced in size. The complaint contends that the use of those photographs on the poster infringed Ward's alleged copyrights. NGS seeks dismissal of this claim on the ground of fair use.[117]

The fair use defense is codified in Section 107 of the 1976 Act[118] and requires

---

**112.** Ward's reliance on the Ninth Circuit's opinion in *Gardner v. Nike, Inc.,* 279 F.3d 774 (9th Cir.2002), also is misplaced. That case concerned the rights of an exclusive copyright licensee to sublicense those rights without the permission of the licensor. As defendants correctly point out, this case is distinguishable in that *Gardner* did not involve a separate copyright in a collective work owned by a publisher. Instead, *Gardner* concerned the classic situation of a company sublicensing its rights to a cartoon character under an exclusive licensing agreement. The court held that the licensee did not have the right to sublicense the use of the cartoon character without the owner's permission.

**113.** 17 U.S.C. § 201(c).

**114.** This Court previously dismissed all copyright infringement claims against Kodak for the Pre–1978 Works. *Faulkner,* 211 F.Supp.2d at 472–75.

**115.** *See Matthew Bender & Co., Inc. v. West Publ'g Co.,* 158 F.3d 693, 706 (2d Cir.1998).

**116.** Clayman–DeAtley Decl. (*Ward* DI 60) ¶ 2 & Ex. A.

**117.** Plaintiff Ward does not contest defendants' factual averments with respect to the poster claim. *See* Def. 56.1 St. (*Ward* DI 60) ¶¶ 40–41; Pl. Opp. 56.1 St. (*Ward* DI 66) ¶¶ 40–41. Defendants' averments therefore are deemed established. S.D.N.Y. Civ. R. 56.1.

**118.** 17 U.S.C. § 107.

consideration of the purpose and character of the use, the nature of the copyrighted work, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and the effect of the use upon the potential market for or value of the copyrighted work. In this case, the use of the individual *Magazine* covers, in essence as part of a photo montage on a celebratory poster representing the long history of the NGS, was transformative.[119] The photographs had been published previously, so plaintiff's interest in controlling first publication is not at stake.[120] In all instances but one, the cover photographs were only a small part of Ward's copyrighted work, and the fact that the entire copyrighted work was used in the last instance does not preclude a fair use defense.[121] Finally, there is absolutely no basis for supposing that the use of a very small reproductions of a few of Ward's cover photographs along with scores of other cover photographs in a celebratory poster that never was sold had any detrimental effect on the market for those photographs.

Accordingly, NGS's use of these photographs on the poster was a fair one, and it is entitled to dismissal of this claim.[122]

## F. The Request to Declare that Certain Plaintiffs Are Entitled to Registration

Certain plaintiffs seek summary judgment declaring that they are entitled to registration of copyright in certain works.[123]

Section 411(a) of the 1976 Act provides in substance that registration of copyright is a prerequisite to the commencement of an infringement action unless registration has been sought and denied, in which case the applicant may sue "for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights." [124] The Register in such a case may become a party on the issue of registerability.[125] If the statute is complied with, the Court may review the denial of registration and allow maintenance of the action if the denial was incorrect. The Court further assumes without deciding that it may direct registration in an appropriate case. But the issue is not properly before the Court.

The revised second amended complaint on behalf of Douglas Faulkner in No. 97 Civ. 9361 does not seek review of any denials of registration or make any other allegations that might invoke Section 411(a).[126] The outside date fixed by the scheduling order, as amended,[127] for seek-

---

119. *See, e.g., Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818–20 (9th Cir.2003).

120. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563–64, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Arica Inst. v. Palmer*, 970 F.2d 1067 (2d Cir.1992).

121. *See, e.g., Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Ringgold v. Black Entm't Television*, 126 F.3d 70 (2d Cir.1997); *Triangle Publ'ns, Inc. v. Knight–Ridder Newspapers*, 626 F.2d 1171, 1177 n. 15 (5th Cir.1980).

122. Ward's memorandum in opposition to defendants' motion does not argue otherwise.

123. Douglas Faulkner in No. 97 Civ. 9361 and Sally Faulkner, Jacobson, Sartorelli and Jacobson in No. 99 Civ. 12488. (The notice of motion (*Faulkner* DI 76) purports to seek such relief on behalf of Douglas Faulkner also in No. 99 Civ. 12488. Douglas Faulkner, however, is not a party to that action.)

124. 17 U.S.C. § 411(a).

125. *Id.*

126. *Faulkner* DI 57.

127. According to the amended scheduling order, the final date to amend pleadings in No. 97 Civ. 9361 was July 15, 2000. *Faulkner* DI 9.

ing further amendment of the pleadings expired long ago. This plaintiff has offered no reason for the belated injection of this issue into that case. But the Court need not rely on that unexplained tardiness.

■ There simply is no reason to grant declaratory relief here. A declaratory judgment is a discretionary remedy.[128] The purpose of the portion of Section 411(a) that permits a district court in an infringement action to engage in collateral review of a denial of registration by the Register was to facilitate the bringing of infringement actions by overruling *Vacheron & Constantin–LeCoultre Watches, Inc. v. Benrus Watch Co.*,[129] which previously

had forced an unsuccessful applicant for registration to bring and win an action against the Register to compel registration before commencing an infringement action.[130] As the infringement claims of the relevant plaintiffs all would be without merit even if they were entitled to registration, there is no need to review the Register's actions in this case. Accordingly, the Court exercises its discretion to decline to entertain these claims for declaratory relief.

### III. The Common Law Claims

Jurisdiction in these cases is premised exclusively upon the existence of federal questions arising under the Copyright Act.[131] As the federal claims against all

128. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d Cir.1996); *In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d Cir.1993), *cert. denied*, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994); *Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*, 26 F.Supp.2d 698, 712 (S.D.N.Y.1998); *Goldberg v. Winston & Morrone, P.C.*, No. 95 Civ. 9282(LAK), 1997 WL 139526, at *3 (S.D.N.Y. Mar.26, 1997).

129. 260 F.2d 637 (2d Cir.1958).

130. H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. at 157 (1976), *reprinted in* 5 U.S.C.C.A.N. 5659, 5773.

131. The only federal claims in the complaint in No. 99 Civ. 12385 were for copyright infringement and relief under the Digital Millennium Copyright Act ("DMCA"). Ward's claim under the DMCA was dismissed previously. *Ward*, 208 F.Supp.2d at 449–50.
The situation in No. 97 Civ. 9361 is more complex. The amended complaint (*Faulkner* DI 11) contained a dilution claim under 15 U.S.C. § 1125(c) in addition to the copyright infringement claim. Subsequent to the filing of the amended complaint, however, three plaintiffs in No. 97 Civ. 9361—Psihoyos, Matrix, and Rickman—terminated Stephen A. Weingrad, Esq., as their attorney and replaced him with Richard F. Schaden, Esq. (*Faulkner* DI 17) Later still, Mr. Weingrad filed a purported Revised Second Amended

Complaint in that action which contained no federal claim except for copyright infringement. The caption and body of the complaint listed Douglas Faulkner, Psihoyos, Matrix and Rickman as the only plaintiffs, and the pleading purported to have been filed on their behalves notwithstanding that Mr. Weingrad no longer represented the last three. (*Faulkner* DI 57) Accordingly, the effect of this pleading was to drop Mr. Faulkner's federal dilution claim. In view of Mr. Weingrad's lack of authority to act for the others, it was a nullity as to them, which left the amended complaint as the operative pleading in their cases. While there is uncertainty as to whether and to what extent plaintiffs Psihoyos, Matrix and Rickman further amended the complaint, *compare* Yavlovsky Decl. (*Faulkner/Hiser*) ¶ 7 & Ex. 6, *with* docket sheet, their counsel, by letter dated November 25, 2003, formally abandoned the dilution claim previously asserted on their behalves and affirmed that no federal claim, other than copyright infringement, is asserted on by those plaintiffs or plaintiff Austen.
No. 99 Civ. 12488 presents yet another situation. The amended complaint in that action (*Hiser* DI 7) also contained a federal dilution claim under 15 U.S.C. § 1125(c). That pleading, however, was superseded by another revised second amended complaint (*Hiser* DI 40), which dropped that claim.
The complaint filed in No. 02 Civ. 6623 contained both a copyright infringement claim and a claim under DMCA. Plaintiffs' memorandum states that they have stipulated to the

defendants have been resolved in advance of trial, the state law claims [132] will be dismissed for lack of subject matter jurisdiction.[133] In No. 99 Civ. 12385, however, the subject matter dismissal of the state law claims is without prejudice to the filing, on or before December 21, 2003, of an amended complaint adequately alleging not only complete diversity of citizenship, but the requisite matter in controversy.[134]

### Conclusion

For the foregoing reasons, defendants' motions for summary judgment dismissing plaintiffs' copyright infringement and breach of contract claims [97 Civ. 9361 DI 74 (applicable also to 99 Civ. 12488); 99 Civ. 12385 DI 60; 02 Civ. 6623 DI 5] are granted to the extent that the copyright infringement claims all are dismissed on the merits, save that the defendants' motion in No. 02 Civ. 6623 is withdrawn insofar as it originally sought dismissal of the copyright infringement claims of plaintiff Psihoyos with respect to the two photographs referred to in note 30. All state law claims, to the extent not previously dismissed on the merits, are dismissed for lack of subject matter jurisdiction, the latter dismissal in No. 99 Civ. 12385 being on the basis set forth above.[135] Plaintiffs' motions for partial summary judgment [97 Civ. 9361 DI 76 (applicable also to 99 Civ. 12488); 99 Civ. 12385 DI 58, 62, 63] are denied in all respects.

This ruling determines all remaining claims against all remaining parties in Nos. 97 Civ. 9361, 99 Civ. 12385, and 99 Civ. 12488 save (a) the claims against Dataware, which have been stayed in light of its bankruptcy, (b) the possibility of an amended complaint showing diversity jurisdiction in No. 99 Civ. 12385, and (c) plaintiff Psihoyos' infringement claim in Nos. 97 Civ. 9631 and 02 Civ. 6623 based on the two photographs referred to in note 30.

This decision is likely to be dispositive with respect to Dataware should the claims against it survive bankruptcy. Delay of review of this decision in those actions would subject the parties to continued uncertainty concerning important legal rights. Nothing that remains to be decided in this Court will affect the fundamental conclusions reached here concerning the interpretation of Section 201(c) of the 1976 Act and its availability to defendants in this case.

Accordingly, the Court determines, pursuant to Fed.R.Civ.P. 54(b), that there is no just reason for delay and directs the Clerk to enter final judgment as follows:

(a) In No. 97 Civ. 9361,

(1) dismissing the claims of all plaintiffs other than Psihoyos against all defendants other than Dataware, and

(2) dismissing all claims by plaintiff Psihoyos except his claims against Dataware and his claim for infringement of his alleged copyrights in the photographs referred to in note 30.

---

dismissal of the DMCA claim. Pl. Opp. Mem. (*Psihoyos* DI 14) 41–42. Although no such stipulation has been filed, the Court deems the claim to have been abandoned.

**132.** No state law claims are asserted in No. 02 Civ. 6623.

**133.** *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218

(1966); *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001); *see* 28 U.S.C. § 1367(c)(3).

**134.** The pleadings in the other cases contain allegations showing that complete diversity of citizenship is absent.

**135.** There are no state law claims in 02 Civ. 6623.

(b) In No. 99 Civ. 12488, dismissing the claims of all plaintiffs against all defendants other than Dataware.

(c) In No. 02 Civ. 6623, dismissing the claims of all plaintiffs against all defendants except for the copyright infringement claims of Psihoyos based on the photographs referred to in note 30.

For the same reasons, the Clerk is directed to enter final judgment dismissing all claims of all plaintiffs in No. 99 Civ. 12385 unless an amended complaint sufficiently showing the existence of subject matter jurisdiction over the state law claims is filed on or before December 21, 2003.

The parties shall appear for a pre-trial conference at 11:30 A.M. on December 22, 2003, in Courtroom 12D.

SO ORDERED.